MOORE, Judge.
Kenneth Nance and Pamela Nance appeal from summary judgments entered by the Madison Circuit Court in favor of Mike Southerland, Southerland Insurance Company, Windsor Insurance Company, and Infinity Insurance Company (hereinafter sometimes referred to collectively as “the defendants”).

Facts

The relevant evidence submitted by the parties in support of or in opposition to the motions for a summary judgment shows the following. In 2003, the Nances decided to procure new automobile-insurance coverage. Kenneth testified that he and Pamela discussed the matter and agreed that Pamela would obtain the insurance through Southerland Insurance Company (“Southerland”).[1] Kenneth testified that he and Pamela had previously discussed that they needed to make sure they obtained uninsured-motorist coverage of between $25,000 and $50,000 and medical-payments coverage. Kenneth stated that he had specifically instructed Pamela, before she went to Southerland’s office, to get insurance in both their names.
On May 14, 2003, Pamela met with Mike Southerland and informed him that she was seeking automobile insurance on behalf of herself and Kenneth. Pamela testified that, during the meeting, she requested that Mike obtain an automobile-insurance policy designating both herself and Kenneth as named insureds and providing “full coverage”; however, Pamela did not specifically request uninsured-motorist coverage. Pamela testified that Mike agreed to her requests and that he then proceeded to fill out an application for an automobile-insurance policy. According to Pamela, as part of the application process, she told Mike all she could remember regarding her and Kenneth’s driving histories, some of which was negative. Pamela testified that she then signed some documents, but she did not remember what documents or how many *615 documents she signed. She also testified that Mike quoted her a premium price but that she did not pay anything at that time.
Pamela testified that she left Souther-land’s office and returned 30 or 40 minutes later, followed by Kenneth. According to Pamela, at that time, Kenneth provided Mike information regarding Kenneth’s personal identification numbers as well as the motor-vehicle identification numbers of the two automobiles to be insured. Pamela testified that both she and Kenneth reiterated to Mike that they wanted full coverage in both their names. Pamela testified that Kenneth had inquired of Mike whether full coverage included uninsured-motorist and medical-payments coverage. Pamela testified that Mike had responded that those coverages would be included. Pamela testified that Mike had told them that Kenneth did not need to sign anything.
Pamela stated that the Nances tendered to Mike a check for approximately $136, which was intended as the premium for “full coverage.” Pamela did not recall Mike informing her that the premium she was paying may be subject to increase based on a review of the Nances’ driving records. Kenneth testified that Pamela left to go to school immediately after they gave Mike the check. Pamela testified that Mike did not provide her any documents to take with her regarding automobile insurance. Kenneth testified that Mike provided him with temporary proof-of-insurance cards and a receipt for the premium payment. Kenneth testified that Mike then told him a policy would be mailed to the Nances. Mike testified that he had no specific recollection of his meetings with Pamela and Kenneth.
The application Mike completed sought automobile-insurance coverage from Windsor Insurance Company (“Windsor”).[2] The application, entitled “Windsor Auto Alabama Private Passenger Automobile Application,” consists of two pages. The first page identifies “Pamela Nance” as the only applicant and contains space for information on past moving violations and traffic accidents, which is blank. Under a section entitled “COVERAGE INFORMATION,” the application lists “Uninsured Motorists” and “Medical Payments” and provides various options. An “X” is marked in the boxes entitled “Reject” under both categories. The application indicates that the policy would be in effect for 6 months and that the total premium would be $547, with a 25% down payment of $136.75 payable immediately, followed by 4 equal quarterly payments of 18.75% of the total premium.
The second page consists of, among other things, a section entitled in bold print “UNINSURED MOTORISTS COVERAGE-ALL APPLICANTS MUST SIGN FORM IF UM IS REJECTED.” Immediately beneath that language, the application states:
“I elect to REJECT protection against Uninsured Motorists as provided in the applicable statutes which permit me to reject insurance against loss caused by uninsured motorists. The undersigned (and each of them) do(es) hereby reject such Insurance coverage, and it is hereby understood and agreed: that such coverage will not be afforded any person by this policy; that this rejection of Uninsured Motorists Coverage applies with respect to all vehicles now insured under the policy as well as any vehicle which may be covered by the policy in the future regardless of whether or not *616 it is owned by the insured on the date of execution of this rejection instrument. “MUST BE SIGNED. Applicant(s) signature(s):”
Pamela signed and dated that section.
The second page of the application further provided, in pertinent part:
“I understand [Windsor] will investigate my application for insurance. I authorize [Windsor]: ... to request driving records or motor vehicle reports (‘MVR’) for every driver listed herein.... I understand the purpose will be to collect information to rate and underwrite my policy.... If data in a ... MVR warrants a premium increase, I agree to pay any additional premium.
“All available coverages were explained to me. I knowingly made the selections indicated herein. Any portion of the application filled out by an agent or broker is expressly acknowledged to have been done at my request. I understand that I am entitled to receive a copy of this application at the time of application.... ”
Pamela signed and dated the application just below that language.
In his deposition, Kenneth denied ever seeing the application. In her deposition, Pamela testified that she did not recall seeing the application, but she indicated that she must have seen it because she had signed it. Pamela, a school teacher, stated that she was “pretty much” an educated person capable of reading and understanding the English language. After reviewing the first page of the application, Pamela testified that, without further explanation, she could not have understood that she was rejecting uninsured-motorist and medical-payments coverage. Upon reviewing the second page of the application, Pamela testified that she understood that the application indicated she was rejecting uninsured-motorist coverage. However, Pamela testified that she did not read the language rejecting uninsured-motorist coverage before signing the application. Pamela testified that she had assumed and had trusted that she was getting the coverage she requested so she had signed the application without reading it. Pamela denied that anyone had prevented her from reading the application.
On May 14, 2003, based on the information contained in the application, Windsor generated an automobile-insurance policy for the Nances (“the policy”). The declarations page for that policy listed “Pamala Nance” as the “named insured.” The declarations page did not list any coverage for uninsured-motorist insurance or medical-payments insurance. Vanessa Bray, a Windsor employee, testified that the policy, including the declarations page, should have been mailed to the Nances so they could verify that they had obtained the coverage they requested. Mike testified that, if the Nances had reviewed the policy, they could have contacted him if they perceived any problems. The Nances testified that they never received a copy of the policy.
As part of the process of generating the policy, Windsor conducted a driving-record check on the Nances, which revealed some negative information that had not been disclosed in the application. Based on that new information, Windsor increased the premium for the policy by $205, which rendered the $136.75 down payment made by the Nances insufficient. Windsor drafted an “Important Notice to the Insured” and a “Special Notice” advising Pamela of the increase in the premium and the information upon which that increase had been based. Bray testified that those notices should have been sent to Pamela as part of the policy.
*617 On May 16, 2003, Windsor drafted a document entitled “Notice of Cancellation of Family Auto Policy” (“the notice of cancellation”). That document, which was directed to Pamela at the address stated in the application, with a copy to Southerland as Pamela’s agent, stated, in pertinent part:
“YOU ARE HEREBY NOTIFIED IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THE ABOVE MENTIONED POLICY THAT YOUR INSURANCE WILL CEASE WITHOUT FURTHER NOTICE AT AND FROM THE HOUR AND DATE MENTIONED ABOVE (12:01 AM 5/28/03) DUE TO NONPAYMENT OF PREMIUM.
“REASON FOR CANCELLATION— NOT ENOUGH DOWNPAYMENT RECEIVED FOR POLICY PREMIUM: DEFICIENT BY $51.25
“TO PREVENT THE CANCELLATION OF YOUR POLICY, YOUR PAYMENT MUST BE POSTMARKED ON OR BEFORE 05/27/03. YOUR POLICY WILL NOT BE REINSTATED IF YOUR PAYMENT OF THE FULL AMOUNT SHOWN AS PAST DUE ON THIS NOTICE IS NOT POSTMARKED BY 05/27/03.
⅜ ⅜ ⅜ ⅜ ⅝ ⅝
“AMOUNT PAST DUE — $51.25 WHICH WAS DUE ON 05/14/03”
(Capitalization in original.)
Windsor placed into evidence two internal certificates of mailing, a federal certificate of mailing,[3] and the affidavit of Kendra Slagle, a “litigation specialist,” all of which were intended to. prove that Windsor had mailed the notice of cancellation to Pamela on May 17, 2003. Bray testified that a copy of the notice of cancellation also should have been mailed to Southerland. Mike testified on behalf of Southerland that he did not receive a copy of the notice of cancellation but that he did receive another notice from Windsor, presumably the “Important Notice to the Insured,” indicating that the Nances owed an additional premium. Mike stated that he placed that notice in his file and that he did not take any steps to ensure that the Nances were aware of the premium deficiency or of the impending cancellation of their automobile-insurance policy. The Nances deny that they ever received the notice of cancellation from Windsor or any other notice of the premium deficiency. The Nances did not pay the additional premium, and Windsor canceled the policy as of May 28, 2003, without providing further notice to Southerland or the Nances.
On June 21, 2003, Kenneth received injuries in a two-car accident, allegedly due to the negligence of Christopher Cummings, the operator of the other automobile. Several days after the accident, Kenneth telephoned Mike to make a claim under the Windsor policy, only to be informed that the Nances had no insurance coverage. Kenneth testified that Mike never explained why the Nances did not have coverage, but Mike testified that he vaguely recalled telling Kenneth that the policy had been canceled due to nonpayment of the additional premium. The Nances stated in their affidavits that they had settled their claim against Cummings *618 for $25,000, the limits of his automobile-liability coverage; however, the Nances maintained that their damages exceeded $25,000 and that those excess damages would have been covered under the medical-payments and uninsured-motorist coverages they had requested.
The Nances filed an eight-count complaint against the defendants that, as amended, basically alleged that the defendants had negligently, wantonly, and fraudulently failed to procure and provide for them the insurance they had requested and that the defendants had negligently, wantonly, and fraudulently failed to inform them of the premium deficiency and of the status of their automobile-insurance coverage. The Nances alleged that Windsor and/or Infinity Insurance Company (“Infinity”), which had merged with Windsor (see supra note 2), had breached the insurance contract, had failed to pay the Nances uninsured-motorist benefits, and had committed bad faith. The Nances also claimed that Windsor and/or Infinity and Souther-land had negligently or wantonly hired, trained, or supervised their agents and employees as to how to advise insureds and provide coverage and that Windsor and/or Infinity was vicariously liable for the actions of those persons causing the Nances’ damages. Pamela additionally claimed loss of consortium.
On January 4, 2007, Windsor and Infinity moved for a summary judgment on all counts asserted in the amended complaint. On January 9, 2007, Mike and Southerland moved for a summary judgment on all counts asserted in the amended complaint. On February 27, 2007, the Nances filed a response opposing the summary-judgment motions. To their response, the Nances attached their affidavits, in which they stated, among other things, that, had they received the declarations page of the policy, they would have taken steps to assure that they obtained medical-payments and uninsured-motorist coverage and that, had they received notice of the premium deficiency and the notice of cancellation, they would have cured the deficiency in order to keep the policy in force.
On February 28, 2007, the Nances filed a motion to strike the defendants’ evidence purporting to prove that Windsor mailed the notice of cancellation. In their response to the summary-judgment motions, the Nances argued that, without that evidence, the defendants had not proven an effective cancellation of the policy. On March 1, 2007, Mike and Southerland filed a brief in opposition to the Nances’ motion to strike, which Windsor and Infinity later joined.
On March 12, 2007, without expressly ruling on the Nances’ motion to strike, and without specifying its reasons, the trial court entered an order granting the summary-judgment motions on all counts asserted in the Nances’ amended complaint except the negligence claim against Mike and Southerland. On June 30, 2008, Mike and Southerland renewed their motion for a summary judgment on the remaining negligence count, submitting, among other evidence, portions of the deposition of the Nances’ expert witness, Lynn Hare Phillips.[4] On September 23, 2008, the Nances responded to the renewed summary-judgment motion and filed a motion to strike the portions of the deposition of Phillips upon which Mike and Southerland relied. On December 23, 2008, the trial court entered a summary judgment as to the remaining negligence count against Mike and *619 Southerland, again without specifying its reasons and without expressly ruling on the Nances’ motion to strike. The Nances timely appealed to the Alabama Supreme Court; that court transferred the appeal to this court on May 20, 2009, pursuant to Ala.Code 1975, § 12-2-7(6).

Issues

On appeal, the Nances primarily argue that the trial court erred in entering summary judgments for the defendants on their negligence, wantonness, fraud, breach-of-contract, uninsured-motorist, and respondeat superior claims.[5] The Nances also argue that the trial court erred in denying their motions to strike. We need not decide the second issue, because, without considering the evidence the Nances moved to strike, we hold that the trial court properly entered the summary judgments for the defendants.

Standard of Review

“The standard of review applicable to a summary judgment is the same as the standard for granting the motion.” McClendon v. Mountain Top Indoor Flea Market, Inc., 601 So.2d 957, 958 (Ala.1992).
“A summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(8), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmov-ing party must present ‘substantial evidence’ creating a genuine issue of material fact — ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ Ala.Code 1975, 12-21-12; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).”
Capital Alliance Ins. Co. v. Thorough-Clean, Inc., 639 So.2d 1349, 1350 (Ala.1994). Questions of law are reviewed de novo. Alabama Republican Party v. McGinley, 893 So.2d 337, 342 (Ala.2004).

Analysis

The Rejectiorir-of-Insurance Issue

The defendants argue that they are entitled to a summary judgment because, they say, Pamela indisputably rejected medical-payments and uninsured-motorist coverage. The defendants presented evidence indicating that Pamela signed the application rejecting medical-payments coverage on the first page and rejecting uninsured-motorist coverage on both pages. Pamela admitted that she signed the application, which unambiguously rejects both coverages, but she stated that she did not read the application before signing it. However, a party capable of reading and understanding English given the opportunity to review an insurance application cannot avoid the legal consequences of signing that document, indicating his or her assent to its terms, on the basis that he or she did not read it. See Kanellis v. Pacific Indem. Co., 917 So.2d 149, 155 (Ala.Civ.App.2005); Syx v. Midfield Volkswagen, Inc., 518 So.2d 94 (Ala.1987). See also Harold Weston, Annota *620 tion, Insured’s Duty to Read Insurance Policy as Affirmative Defense in Claims Against Insurance Agents and Brokers, 8 A.L.R.6th 549, § 27 (2005). Hence, Pamela is bound by her assent to the terms of the application, including her rejection of medical-payments and uninsured-motorist coverage.
The Nances submit that Pamela should not be bound because, they say, Mike negligently or wantonly breached a duty to adequately explain uninsured-motorist and medical-payments coverage to Pamela so that she could make an informed decision before rejecting those coverages. The Nances’ sole “argument” on this point consists of one sentence in their statement of facts in which they recite that Phillips, their expert witness, opined that Mike “should have explained to the Nances what uninsured/underinsured motorist coverage was at the time they were purchasing their insurance” and two clauses in the argument portion of their brief stating, respectively, that Mike negligently and recklessly failed to explain the different coverages to the Nances. The Nances do not cite a single Alabama case or statute recognizing the duty of an insurance agent to advise an applicant of the scope of rejected coverage or any case that would indicate that such a duty exists under circumstances similar to those existing in this case.
The question whether Mike owed a duty to inform the Nances of the various coverages Pamela rejected primarily would be one of law.[6] See, e.g., Meyer v. Norgaard, 160 Wis.2d 794, 467 N.W.2d 141 (Wis.Ct.App.1991). Under Rule 28, Ala. R.App. P., a party has a duty to cite appropriate legal authority to demonstrate that the trial court erred. “ ‘ “[I]t is not the function of [an appellate court] to do a party’s legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument.” ’ ” Ex parte Borden, 60 So.3d 940, 943 (Ala.2007) (quoting Butler v. Town of Argo, 871 So.2d 1, 20 (Ala.2003), quoting in turn Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala.1994)). When the appellant fails to cite any legal authority in support of an argument, this court will consider that argument waived as if it had not been made at all. See Ex parte Borden, supra. Hence, we do not address the issue whether Pamela’s rejection of medical-payments and uninsured-motorist coverage should be considered invalid due to Mike and Southerland’s alleged failure to fully advise her of the scope of those coverages.
The Nances secondly argue that Pamela’s rejection of uninsured-motorist coverage should not apply to Kenneth because, they say, he would have been a named insured on the policy but for Mike’s negligent, wanton, and fraudulent conduct. Under Ala.Code 1975, § 32-7-23(a), only a “named insured shall have the right to reject [uninsured-motorist] coverage.” When only one spouse is the named insured, his or her valid rejection of uninsured-motorist coverage binds the other insured spouse. See Progressive Specialty *621 Ins. Co. v. Naramore, 950 So.2d 1138, 1142 (Ala.2006); Progressive Specialty Ins. Co. v. Green, 934 So.2d 364, 366 (Ala.2006). On the other hand, when both spouses are named insureds, the rejection of uninsured-motorist coverage by one spouse does not affect the rights of the other spouse to those benefits. See State Farm Mut. Auto. Ins. Co. v. Martin, 292 Ala. 103, 289 So.2d 606 (1974); Nationwide Ins. Co. v. Nicholas, 868 So.2d 457 (Ala.Civ.App.2003). Alabama law has never considered the issue whether a spouse merely intended to be a named insured must sign the uninsured-motorist waiver, but § 32-7-23(a) unambiguously applies only to actual “named insureds,” so Pamela’s rejection does bind Kenneth.
In the application, Mike designated Pamela as the lone applicant and the lone signatory in regard to the rejection of uninsured-motorist coverage. The Nances do not dispute that Pamela signed the application disclosing that she would be the lone “named insured.” In Progressive Specialty Insurance Co. v. Gore, 1 So.3d 996 (Ala.2008), the supreme court held that a wife could not sign a rejection of uninsured-motorist coverage on behalf of her husband when the application disclosed that only the husband would be a named insured. In this case, the undisputed facts present the exact opposite situation, and yield the exact opposite result — Pamela’s decision to be labeled the lone “named insured” authorized her to reject uninsured-motorist coverage on behalf of Kenneth. In light of Pamela’s signing the application unambiguously indicating that she would be the only “named insured,” neither Mike and Southerland nor Windsor and Infinity can be liable for failing to designate Kenneth as a “named insured” under the legal theories advanced by the Nances. See Kanellis, 917 So.2d at 154 (holding that insureds’ failure to read policy disclosing that agent had not procured depreciation coverage they had requested precluded agent’s liability under negligence theory); Syx, supra (holding that insured who failed to read insurance application, which clearly disclosed that insurance would not provide “full coverage,” could not maintain fraud action because insured could not have reasonably relied on oral statement that policy would provide “full coverage” made by automobile seller’s representative).
The Nances maintain that they contracted with, and otherwise expected, Mike and Southerland to procure for them medical-payments and uninsured-motorist coverage. See Montz v. Mead & Charles, Inc., 557 So.2d 1, 4 (Ala.1987) (describing duty of insurance agent to use reasonable skill and care in procuring insurance requested by insurance applicant). However, the application unambiguously discloses that Mike and Southerland did not request such coverage from Windsor. See Syx, supra. Any expectations the Nances might have had regarding the coverages Mike would obtain would be unreasonable as a matter of law under those circumstances. See Banks v. SCI Alabama Funeral Servs., Inc., 801 So.2d 20 (Ala.Civ.App.2001); Mitchell Nissan, Inc. v. Foster, 775 So.2d 138, 140 (Ala.2000). Under the factual circumstances presented in this case, the Nances’ expectations do not create any genuine issue of material fact regarding the validity of Pamela’s rejection of uninsured-motorist coverage.
Based on the duty-to-read defense, Mike and Southerland cannot be liable for negligently, wantonly, or fraudulently failing to designate Kenneth as a named insured or for negligently, wantonly, or fraudulently failing to procure medical-payments and uninsured-motorist coverage for the Nances. Because the Nances validly rejected coverage, Windsor and Infinity cannot be liable for breach of contract or for *622 failing to pay the Nances uninsured-motorist benefits.

The Failure-to-Notify Issue

The Nances next maintain that, although Pamela rejected medical-payments and uninsured-motorist coverage, the defendants negligently, wantonly, and fraudulently deprived them of the right to acquire that coverage later. The Nances first maintain that Windsor had a duty to send them the policy, including the declarations page, which would have revealed to them that Kenneth had not been designated as a named insured and that they had not obtained medical-payments and uninsured-motorist coverage. In their motion for a summary judgment, Windsor and Infinity argued that Windsor owed no duty to the Nances other than those duties arising out of their contractual relationship, which only existed for a brief period. However, during that time, according to Bray, one of the duties Windsor voluntarily undertook was the duty to deliver a copy of the policy, with the declarations page, to the Nances, which Windsor failed to do according to the undisputed evidence in the record.[7] “[A] party ‘who volunteers to act, though under no duty to do so, is ... charged with the duty of acting with due care.’ ” Berkel & Co. Contractors, Inc. v. Providence Hosp., 454 So.2d 496, 503 (Ala.1984) (quoting Dailey v. City of Birmingham, 378 So.2d 728, 729 (Ala.1979)).
At the trial-court level, Windsor and Infinity did not specifically argue that they were entitled to a judgment as a matter of law on the claim that Windsor had negligently failed to send the Nances a copy of the policy. Nevertheless, Windsor and Infinity argued in the trial court generally that all the claims asserted by the Nances failed as a matter of law because the claims are “patently inconsistent with the written terms of the application.” As applied to the Nances’ claim that Windsor failed to deliver the policy, we agree with that argument. The failure to deliver a policy of insurance is actionable only when the insured is prejudiced thereby. See Akpan v. Farmers Ins. Exch., Inc., 961 So.2d 865, 871 (Ala.Civ.App.2007). Prejudice obviously may occur when an insured has no actual or constructive knowledge of a limitation on, or exclusion from, coverage until delivery of the policy, see Ex parte Clarke, 728 So.2d 135 (Ala.1998); however, when the policy merely conforms to the limitations set out in the insurance application, of which the insured is charged with knowledge, the insured cannot claim any prejudice from a failure of the insurer to deliver the policy. See generally Danforth v. Government Employees Ins. Co., 282 Ga.App. 421, 426, 638 S.E.2d 852, 858 (2006) (“ ‘When an insurance company fails to mail or deliver the insurance policy to the insured within a reasonable amount of time after its issuance, the insurance company may still rely on exclusions contained in the policy of which the insured otherwise had notice.’ ” (quoting, with modifications, Williams v. Fallaize Ins. Agency, 220 Ga.App. 411, 414, 469 S.E.2d 752, 756 (1996))); Kozlik v. Gulf Ins. Co., 268 Wis.2d 491, 503, 673 N.W.2d 343, 349 (Wis.Ct.App.2003) (“We therefore hold that an *623 insurer may not deny coverage based on limitations or exclusions in a policy, even if clearly stated, ivhere the insured was not otherwise informed of stick provisions.” (emphasis added)).
The Nances maintain that, had they received the policy, they would have realized only then that they had not obtained medical-payments and uninsured-motorist coverage and that they would have taken steps to cure those omissions. However, as a matter of law, the Nances already were aware from the contents of the application that they had not requested those coverages. See Locklear Dodge City, Inc. v. Kimbrell, 703 So.2d 303, 306 (Ala.1997) (“[T]his Court has held that a person who signs a contract is on notice of the terms therein and is bound thereby even if he or she fails to read the document.” (citing Power Equip. Co. v. First Alabama Bank, 585 So.2d 1291 (Ala.1991))). They cannot claim in retrospect, after they have sustained a loss presumably within the scope of medical-payments and uninsured-motorist coverage, that they would have taken some action to secure that coverage based on the information in the declarations page when they had not taken that action already based on their knowledge of the information contained in the application. See W.G. Yates & Sons Constr. Co. v. Zurich American Ins. Co., (Civil Action No. 06-0803-WS-B, Jan. 8, 2008) (S.D.Ala.2008) (not reported in F.Supp.2d) (finding insured’s argument that it would have obtained replacement insurance had it received policy to be unavailing when insured was already generally aware of type of policy exclusion at issue).
The Nances next argue that the defendants did not notify them of the premium deficiency and of the impending cancellation of the policy for nonpayment of premium. At her deposition, Bray produced the “Important Notice to the Insured” and a “Special Notice” describing the increase in the premium and the information upon which that increase had been based. Bray testified that those notices should have been sent to Pamela as part of the policy. However, Windsor and Infinity presented no evidence indicating that Windsor had, in fact, mailed those notices. Mike testified that he received a premium-deficiency notice, presumably one or both of those documents, but that he did not contact the Nances to ensure they knew they owed an additional premium. The Nances denied that they received any documents from Windsor, including the premium-deficiency notices. The evidence appears undisputed that the Nances did not receive the notices of the premium deficiency.
Whether the evidence sufficiently demonstrates that the Nances received the notice of cancellation depends on application of a particular statute, Ala.Code 1975, § 27-23-25, which provides:
“Proof of mailing of notice of cancellation or of reasons for cancellation to the named insured at the address shown in the policy shall be sufficient proof of notice.”
Pursuant to that statute, if the insurer provides clear and convincing evidence of a definite and specific character that it mailed a notice of cancellation of a policy of automobile-liability insurance, then that evidence sufficiently proves the insured received notice of the cancellation. See Ex parte Alfa Mut. Gen. Ins. Co., 742 So.2d 182, 185 (Ala.1999). The parties dispute whether the defendants presented admissible and clear and convincing evidence indicating that Windsor mailed the notice of cancellation in compliance with § 27-23-25; solely for the purposes of this opinion, we will assume that the defendants did not. Hence, it is not necessary to rule on the Nances’ motions to strike, both of which are directed toward evidence re *624 garding the mailing of the notice of cancellation and its effectiveness to notify the Nances of the cancellation of the policy.
The Nances contend that Windsor owed them a duty to properly notify them of the premium deficiency and impending cancellation of their policy and that, under the specific circumstances of the case, Mike owed them a duty once he received the notice of deficiency to advise them of that notice and its effect on the status of their policy.[8] Assuming, without deciding, the truth of those assertions, we conclude, as matter of law, that any breach of those duties did not proximately cause the damage of which the Nances complain.
The proximate cause of an injury is “ ‘the direct and immediate, efficient cause of the injury.’ ” Mobile City Lines, Inc. v. Proctor, 272 Ala. 217, 224, 130 So.2d 388, 394 (1961) (quoting Western Railway of Alabama v. Mutch, 97 Ala. 194, 196, 11 So. 894, 895 (1892)). Proximate cause is defined as “an act or omission that in a natural and continuous sequence, unbroken by any new and independent causes, produces the injury and without which the injury would not have occurred.” Byrd v. Commercial Credit Corp., 675 So.2d 392, 393 (Ala.1996).
“[Gjenerally proximate cause is a question to be determined by the trier of the fact. Even so, the question of proximate cause may be decided by a summary judgment if ‘“there is a total lack of evidence from which the fact-finder may reasonably infer a direct causal relation between the culpable conduct and the resulting injury.” ’ Green v. Alabama Power Co., 597 So.2d 1325, 1328 (Ala.1992) (quoting Davison v. Mobile Infirmary, 456 So.2d 14, 24 (Ala.1984)); see also Cooley v. Gulf Bank, Inc., 773 So.2d 1039, 1044 (Ala.Civ.App.1999) (Crawley, J., concurring in part and dissenting in part).”
Gooden v. City of Talladega, 966 So.2d 232, 239-40 (Ala.2007). In this case, the Nances testified that, had they been notified of the premium deficiency and of the impending cancellation of their automobile-insurance policy, they would have paid the premium in order to keep the policy in force. However, that payment would not have increased the coverage to include medical-payments and uninsured-motorist coverage for which the Nances did not contract. Hence, the omission of which the Nances complain — the failure to notify them of the premium deficiency and impending cancellation of the policy for that reason — did not produce the injury at issue — lack of medical-payments and uninsured-motorist coverage.
Thus, we hold that the trial court properly entered summary judgments on the various claims arising out of the failure of the defendants to provide to the Nances the policy, the premium-deficiency notices, and the notice of cancellation.

Conclusion

We conclude that the trial court did not err in entering the summary judgments for the defendants. The evidence shows without dispute that Pamela signed an application for automobile insurance rejecting medical-payments and uninsured-motorist coverage. As a result, the Nances obtained a policy of automobile insurance that did not contain those coverages. Any alleged subsequent omission by the defendants did not affect the scope of the cover *625 age obtained and did not proximately cause the Nances to forgo the procurement of the additional insurance they claim they wanted. Regardless of the theory of liability advanced, the defendants are entitled to a judgment as a matter of law.
AFFIRMED.
PITTMAN, BRYAN, and THOMAS, JJ., concur.
THOMPSON, P.J., concurs in the result, without writing.

. In his deposition, Mike Southerland testified that the correct legal name of the business is S.I., Inc.; however, the pleadings were never amended to reflect that designation.

. Windsor Insurance Company had merged with Infinity Insurance Company, but the policy in this case was issued under the name of Windsor Insurance Company.

. A federal certificate of mailing is "a service offered by the United States Postal Service. Upon payment of an additional fee, domestic customers can get a certificate evidencing the mailing of a specific piece of mail on a specific day." Sisson v. State Farm Fire & Cas. Co., 824 So.2d 708, 709 n. 1 (Ala.2001). A federal certificate of mailing "serves as proof that the United States Postal Service received and sent a particular piece of mail.” Echavarria v. National Grange Mut. Ins. Co., 275 Conn. 408, 415, 880 A.2d 882, 886 (2005).

. The Nances tendered Phillips, an attorney, as an expert regarding the standard of care required of an insurance agent and the breaches of that standard of care by Mike and Southerland.

. The Nances make no argument that the trial court erred in entering summary judgments as to their bad-faith, loss-of-consortium, and negligent and wanton hiring, training, and supervision claims. Therefore, we will not discuss those claims further.

. Other jurisdictions are split on this issue based primarily on whether the duties of an insurance agent to advise an applicant regarding coverages arise under common law or statutory provisions. See, William H. Danne, Jr., Annotation, Construction of Statutory Provision Governing Rejection or Waiver of Uninsured Motorist Coverage, 55 A.L.R.3d 216, § 4 (1974) ("Where the statute permitting an insured to 'reject' otherwise mandatory uninsured motorist coverage is silent upon the matter, different opinions have been expressed as to whether a particular insured's refusal of such coverage, if otherwise sufficient as a statutory rejection, is rendered ineffective by the insurer's failure to have explained the nature of uninsured motorist protection to him.”).

. In their reply brief, the Nances argue, for the first time, that Windsor had a duty under Ala.Code 1975, § 27-14-19(a), to deliver the policy and that Windsor's failure to do so estopped Windsor from denying medical-payments or uninsured-motorist coverage, citing Brown Machine Works & Supply Co. v. Insurance Co. of North America, 659 So.2d 51, 61 (Ala.1995). We hereby grant Windsor and Infinity’s motion to strike that argument, which raises an issue not raised in the trial court and which cannot be raised for the first time in a reply brief. See McGough v. G & A, Inc., 999 So.2d 898, 905 n. 3 (Ala.Civ.App.2007) ("Ordinarily, we do not consider issues raised for the first time in a reply brief.”).

. Again, the Nances have not cited any legal authority for the proposition that their insurance agent owed them a duty to notify them of a premium deficiency or of an impending cancellation of their policy. See Rule 28, Ala. R.App. P. We do not decide that question because we affirm the summary judgment in favor of Mike and Southerland on different grounds.