STUART, Justice.[1]
Alfa Life Insurance Corporation (“Alfa”) and Brandon Morris, an agent for Alfa, appeal a judgment entered against them following a jury verdict for Kimberly Col-za, the widow of Dante Colza. We reverse the judgment and render a judgment for Alfa and Morris.
I.
On September 2, 2010, Morris met with Dante to assist him in completing an application for a life-insurance policy in the amount of $150,000. Kimberly and Justin Morton, an employee of Dante’s, were also present at the meeting. The application process for an Alfa life-insurance policy consists of three parts: the applicant’s completion of an application agreement, the applicant’s answering various health questions before a medical examiner, and the medical examiner’s report. Morris testified that he asked Dante the questions *1243 in the application agreement and then typed the answers on the application form on his laptop computer. Although the evidence is disputed as to whether Morris asked Dante question 16(g) — whether Dante had had a moving traffic violation, a driver’s license suspended, or an accident in the prior three years — it is undisputed that Morris entered a checkmark in the “No” box by that question. The evidence indicated that Dante applied for the Preferred Tobacco premium rate.[2] Dante named Kimberly as the beneficiary under the policy. Disputed evidence was presented as to whether Dante himself signed the application agreement.
At the close of the meeting, Morris provided Dante and Kimberly with a hard-copy document entitled “Applicant’s Copy of Notices — Authorization—Agreement— Receipt Signed Electronically” (hereinafter referred to as “the application agreement”). The relevant portion of the application agreement stated:
“I understand and agree with the Company that:
“1. Any policy issued as a result of this Application shall constitute a single and entire contract of insurance.... Only the President, a Vice President, the Secretary or Actuary of the Company may waive or vary, a contract provision or any of the Company’s rights or requirements and such waiver must be in writing. Only the Company’s Underwriters have any authority to accept or approve the insurance applied [for] or to pass upon insurability.
“2. To the best of my knowledge and belief all of the statements and answers on the Application are true, complete, and correctly stated, and I understand the statements and answers are submitted to the Company as the basis for any policy issued, and if incorrect can be cause for cancellation or loss of coverage.
“3. Unless the policy becomes effective at an earlier date due to full and complete fulfillment of the conditions in the Conditional Receipt, any insurance issued by the Company will not become effective until this Application has been approved and accepted by the Underwriting Department of the Company, and the policy issued has been delivered to the owner of the policy personally and payment to the Company of the full first premium during the lifetime and continued insurability of the Proposed Insured has been made.
“4. I authorize the Company to amend this Application by a notation in the space set aside for ‘Home Office Endorsements’ to correct apparent errors or omissions and to conform the Application to any policy that may be issued by the Company. Acceptance of the policy issued based on this Application will be acceptance of its terms and ratification by me of any changes specified in the section marked ‘Home Office Endorsements.’ Any change in plan or amount of insurance or added benefits must be agreed to in writing.”
The application agreement completed by Dante referenced another document entitled “Conditional Receipt,” which stated in relevant part:
“1. CONDITIONS TO COVERAGE: NO INSURANCE WILL BECOME EFFECTIVE BEFORE THE DELIV *1244 ERY AND ACCEPTANCE OF A POLICY OF INSURANCE UNLESS AND UNTIL EACH AND EVERY ONE OF THE FOLLOWING CONDITIONS IF [sic] FULFILLED EXACTLY:
“(a) The amount of the premium deposit made with the application must be at least equal to the amount of the full first premium for the mode of payment selected in the application and for the plan and the amount of insurance applied for.
“(b) All medical examinations, tests, x-rays and electrocardiograms required by the Underwriting Department of the Company must be completed and received at its Home Office in Montgomery, Alabama, within sixty (60) days from the date of completion of Part 1 of the application....
“(c) The Company’s Underwriting Department at its Home Office must be satisfied that on the Effective Date, as defined below, the Proposed Insured(s) ... was insurable at a risk acceptable to the Company under its rules, limits and standards for the amount applied for at the Company’s standard published rates corresponding to the age of such person, without any modification either as to plan, amount, riders, supplemental agreements, and/or rate of premium.
“(d) On the Effective Date, as defined below, the state of health and all factors affecting the insurability of the Proposed Insured ... must be as stated in the application.
“2. EFFECTIVE DATE: When every one of the conditions contained in paragraph 1 have been fulfilled exactly and completely, then insurance, as provided by the terms and conditions of the policy applied for and in use by the Company on the Effective Date, but for an amount not exceeding that specified in paragraph 3, will become effective as of the Effective Date. ‘Effective Date,’ means the latest of (a) the date of completion of the application PART 1; (b) the date of completion of all medical examinations, tests, x-rays, and electrocardiograms required by the Company; or (c) the Date of Issue, if any requested in the application.
“3. LIMITS OF COVERAGE: The total amount of life insurance, including accidental death benefits, which may become effective prior to delivery and acceptance of a policy of insurance shall not exceed $100,000.
“4. RETURN OF THE DEPOSIT: If any one or more of the conditions in paragraph 1 have not been fulfilled exactly and completely there shall be no liability on the part of the Company except to return the premium deposit in exchange for this receipt. If the application is not accepted and approved by the Company within sixty (60) days from the date of this receipt, then no policy will be issued.
“5. OFFER OF MODIFIED POLICY: If all of the conditions in paragraph 1 have not been fulfilled complétely and exactly but the Company does accept and approve the application upon a modification as to plan, amount, premium rate and/or disallowance of any supplementary benefit applied for, the policy offered shall take effect as of the date which the Company offers to issue said policy, provided that the owner accepts delivery of the policy by paying the full first premium or balance thereof, and if required by the Company signs an Amendment of Application therefor, during the lifetime and continued insura-bility of the Proposed Insured ... according to the Company’s standards, within sixty (60) days from the issue date of the policy.
*1245 “6. NO AGENT, GENERAL OR SPECIAL, OR ANY OTHER PERSON IS AUTHORIZED BY THE COMPANY TO WAIVE OR MODIFY IN ANY WAY ANY OF THE CONDITIONS OR PROVISIONS CONTAINED IN THIS CONDITIONAL RECEIPT.”
(Capitalization in original.) Conflicting evidence was presented at trial as to whether Morris provided Dante and Kimberly with a hard copy of the conditional receipt; however, Kimberly acknowledges that she received an identical conditional receipt when she applied for her own life-insurance policy approximately two weeks before Dante applied for his.
At the close of the meeting, Kimberly wrote a check payable to Alfa for $108.70, the monthly Preferred Tobacco premium rate. Kimberly testified at trial that Morris informed them that Dante would be covered as soon as they gave Morris the check. Morris submitted Dante’s application to Alfa on September 3, 2010.
Dante was examined by the medical examiner on October 15, 2010.[3] During the examination, Dante informed the medical examiner that his family had a history of heart disease and that he had had moving traffic violations within the past five years.[4] On October 16, 2010, the day after he had his medical examination, Dante was killed in an accident. Two days later, Alfa received the medical examiner’s report, which indicated that Dante’s family had a history of heart disease, that Dante’s cholesterol was above 255, and that Dante had had moving traffic violations in the past five years.[5]
In light of Dante’s high cholesterol level and his family history of heart disease, the Alfa underwriters determined that Dante was not eligible for the Preferred Tobacco rate for which he had applied; rather, the proper classification for Dante would have been the Standard Tobacco rate, which had a higher premium. Additionally, in light of Dante’s moving-vehicle .violations, Dante was a greater risk to insure and a “rate-up” of $2.50 per $1,000 worth of coverage was required. The testimony at trial indicated that the new rate for the Standard Tobacco premium and the rate-up would have resulted in a monthly premium of $182.55 per month.
On October 25, 2010, Alfa notified Kimberly by letter that no life-insurance coverage was available for Dante’s death “because no policy was issued and the conditions of coverage under the conditional receipt were not met.”
On April 18, 2011, Kimberly sued Alfa seeking to recover under the terms of the conditional receipt. She alleged, among other claims, that Alfa had breached the contract and had acted in bad faith when it refused to pay life-insurance benefits on Dante’s death. Kimberly also sued Morris, alleging, among other claims, that he had negligently failed to procure insurance coverage for Dante. After a trial, the jury found that Alfa had breached the contract and had in bad faith refused to pay the insurance benefits due pursuant to that contract and that Morris had negligently failed to procure insurance for Dante. The trial court entered a judgment in the amount of $440,674.94 against Alfa and in *1246 the amount of $100,000 against Morris. Alfa and Morris submitted motions for judgments as a matter of law at the close of the evidence and after the entry of the judgment. The trial court denied the motions. Alfa and Morris appeal.
II.
“When reviewing a ruling on a motion for a JML [judgment as a matter of law], this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala. 2003).
III.
Alfa contends that the trial court erred in denying its motions for a judgment as a matter of law because, it says, there was no written or oral contract between Alfa and Dante that obligated Alfa to pay life-insurance benefits to Kimberly. Specifically, Alfa maintains that because the conditions of the application agreement and the conditional receipt were not satisfied, a contract did not exist between Alfa and Dante obligating Alfa to pay Kimberly life-insurance proceeds when Dante died.
Alfa did not receive the report of Dante’s medical examination until two days after he died; thus, review of his application had not been completed at the time of his death, and the life-insurance policy for which he had applied had not been issued. Accordingly, Kimberly’s only possible contractual recourse against Alfa is pursuant to the conditional receipt. The conditional receipt stated that “no insurance will become effective before the delivery and acceptance of a policy of insurance unless and until each and every one of the following conditions i[s] fulfilled exactly.” The evidence indicated that Dante did not fulfill the following conditions:
“(c) The Company’s Underwriting Department at its Home Office must be satisfied that on the Effective Date, as defined below, the Proposed Insured(s) ... was insurable at a risk acceptable to the Company under its rules, limits and standards for the amount applied for at the Company’s standard published rates corresponding to the age of such person, without any modification either as to plan, amount, riders, supplemental agreements, and/or rate of premium.
“(d) On the Effective Date, as defined below, the state of health and all factors affecting the insurability of the Proposed Insured ... must be as stated in the application.”
*1247 The evidence established that, because of Dante’s driving history and other factors, the Alfa underwriters determined that Dante was not “insurable ... for the amount applied for ... without any modification ... as to ... [the] rate of premium.” Additionally, because the application did not indicate that Dante had been issued moving traffic violations in the previous three years, “all factors affecting the insurability [of Dante]” were not as stated in the application. Hence, Dante’s failure to satisfy the conditions set forth in the plain, unambiguous language of the conditional receipt precluded coverage under the conditional receipt.
Kimberly’s argument that Alfa breached an oral contract created by the representations made by Morris is also unpersuasive. Kimberly maintains that Morris’s statement immediately after they completed Dante’s application indicating that Dante would be “immediately covered” upon payment of the premium established an oral contract that bound Alfa. However, the conditional receipt provided that “no agent, general or special, or any other person is authorized by the company to waive or modify in any way any of the conditions or provisions contained in this conditional receipt.” This language negates any claim that Morris, as an agent for Alfa, had actual or apparent authority to immediately bind Alfa.
Equally unpersuasive is Kimberly’s contention that, because, she alleges, the conditional receipt was not delivered to Dante, an issue still exists as to whether Morris had the apparent authority to bind Alfa. However, there is no dispute that Dante received a copy of the application agreement. Paragraph 1 of the application agreement states that “[o]nly the President, a Vice President, the Secretary or Actuary of the Company may waive or vary a contract provision” and “[o]nly the Company’s Underwriters have any authority to accept or approve the insurance applied [for] or to pass upon insurability.” Thus, the application agreement clearly establishes that Morris, an agent for Alfa, did not have apparent authority to immediately bind Alfa. Because the record unequivocally establishes that Dante had not satisfied the terms and conditions set forth in the conditional receipt and, consequently, that no contract existed requiring Alfa to pay insurance proceeds to Kimberly upon Dante’s death, Alfa was entitled to a judgment as a matter of law on this claim.
Moreover, because there was no written or oral contract between Alfa and Dante, Alfa is entitléd to a judgment as a matter of law on Kimberly’s bad-faith-failure-to-pay claim. See State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 304 (Ala. 1999) (recognizing that “ ‘the plaintiff in a “bad faith refusal” case has the burden of proving: (a) an insurance contract between the parties and a breach thereof by the defendant....’” (quoting National Sec. Fire & Cas. Co. v. Bowen, 417 So.2d 179, 183 (Ala.1982))). See also Aplin v. American Sec. Ins. Co., 568 So.2d 757, 758 (Ala. 1990) (stating that “proof of the existence of an insurance contract between the parties is a threshold requirement in a bad faith claim”).
IV.
Morris contends that the trial court also erred, in denying his motions for a judgment as a matter of law on Kimberly’s negligent-procurement claim because, he argues, (1) the evidence did not establish that his alleged negligent failure to procure immediate insurance coverage for Dante proximately caused Kimberly’s alleged injury and (2) regardless of whether he was negligent, the evidence established that Dante and Kimberly were contribu-torily negligent as a matter of law, thus *1248 barring any recovery based upon his alleged negligence. In Kanellis v. Pacific Indemnity Co., 917 So.2d 149, 155 (Ala. Civ.App.2005), the Court of Civil Appeals set forth the elements a plaintiff asserting a negligent-procurement claim is required to establish:
“Like any negligence claim, a claim in tort alleging a negligent failure of an insurance agent to fulfill a voluntary undertaking to procure insurance ... requires demonstration of the classic elements of a negligence theory, i.e., ‘(1) duty, (2) breach of duty, (3) proximate cause, and (4) injury.’ Albert v. Hsu, 602 So.2d 895, 897 (Ala.2002). Under Alabama law, however, contributory negligence is a complete defense to a claim based on negligence. Mitchell v. Torrence Cablevision USA, Inc., 806 So.2d 1254, 1257 (Ala.Civ.App.2000).”
The gravamen of Kimberly’s negligent-procurement claim is that Morris undertook a duty to procure immediate life-insurance coverage for Dante, that he breached that duty, and that his breach caused the resulting injury, that is, a lack of any life-insurance proceeds for Kimberly following Dante’s death before the completed policy could be issued. However, Morris argues that even if he did commit some errors in the process of completing Dante’s application and in calculating the premium due, those errors did not proximately cause any injury because it is undisputed that only the underwriting department at Alfa could calculate the rate-up required for Dante based on his driving record. Thus, he argues, even if he had properly calculated Dante’s premium using the Standard Tobacco rate and initially submitted correct information regarding Dante’s driving history, no coverage would have existed on Dante’s life at the time of his death because the underwriting department had not yet calculated that required rate-up and presented it to the Colzas for their acceptance or refusal.
Regardless of any possible merit in this argument, however, it was not presented to the trial court until after judgment was entered on the jury’s verdict; accordingly, it was waived. Alfa and Morris did not assert the argument that they were entitled to a judgment as a matter of law due to a lack of evidence establishing proximate causation in their combined motions seeking a judgment as a matter of law filed at the close of Kimberly’s case or at the close of all the evidence. As this Court stated in Scott & Scott, Inc. v. City of Mountain Brook, 844 So.2d 577, 597 (Ala.2002), “postjudgment motions are not the proper vehicle for raising new issues.” Rather, the purpose of a renewed motion for a judgment as a matter of law is. to “‘permitn the trial court to revisit its earlier ruling denying’ ” a prejudgment motion for a judgment as a matter of law. Cherokee Elec. Coop. v. Cochran, 706 So.2d 1188, 1191 (Ala.1997) (quoting Alabama Power Co. v. Williams, 570 So.2d 589, 591 (Ala.1990)). Clearly, a trial court may not “revisit” a decision to reject an argument if that argument was not previously asserted. Accordingly, we express no opinion on the merit of Morris’s causation argument because that argument was previously waived.
However, Morris did properly assert in motions filed at the close of Kimberly’s case, at the close of all the evidence, and postjudgment his argument that Kimberly and Dante’s contributory negligence entitled him to a judgment as a matter of law on her negligent-procurement claim; thus, that argument is before us. With regard to establishing contributory negligence as a matter of law, this Court has stated:
“The question of contributory negligence is normally one for the jury. However, *1249 where the facts are such that all reasonable persons must reach the same conclusion, contributory negligence may be found as a matter of law. Brown [v. Piggly-Wiggly Stores, 454 So.2d 1370, 1372 (Ala.1984) ]; see also Carroll v. Deaton, Inc., 555 So.2d 140, 141 (Ala.1989).
“To establish contributory negligence as a matter of law, a defendant seeking a [judgment as a matter of law] must show that the plaintiff put himself in danger’s way and that the plaintiff had a conscious appreciation of the danger at the moment the incident occurred. See H.R.H. Metals, Inc. v. Miller, 833 So.2d 18 (Ala.2002); see also Hicks v. Commercial Union Ins. Co., 652 So.2d 211, 219 (Ala.1994). The proof required for establishing contributory negligence as a matter of law should be distinguished from an instruction given to a jury when determining whether a plaintiff has been guilty of contributory negligence. A jury determining whether a plaintiff has been guilty of contributory negligence must decide only whether the plaintiff failed to exercise reasonable care. We protect against the inappropriate use of a summary judgment to establish contributory negligence as a matter of law by requiring the defendant on such a motion to establish by undisputed evidence a plaintiffs conscious appreciation of danger. See H.R.H. Metals, supra.”
Hannah v. Gregg, Bland & Berry, Inc., 840 So.2d 839, 860-61 (Ala.2002).
Morris argues that the documents received by Kimberly made clear that no immediate coverage on Dante’s life would exist prior to the issuance of a completed life-insurance policy unless certain terms and conditions set forth in the conditional receipt were satisfied. As discussed in Part III of this opinion, those terms and conditions were not met — among other things, Dante’s application did not reveal that he had been cited for moving traffic violations in the past three years. Dante and Kimberly are charged with knowledge of the language in the application agreement and the conditional receipt requiring that all conditions must be satisfied before the insurance was effective; thus, Morris argues, they were contributorily negligent inasmuch as those documents clearly apprised them that they were not guaranteed the immediate coverage on Dante’s life they allegedly sought and Morris is alleged to have negligently failed to procure.
In support of his argument, Morris cites Kanellis, in which the Court of Civil Appeals held that an insurance agency and its agent were entitled to a judgment as a matter of law on the plaintiffs’ negligent-procurement claim because the insurance policy issued to the plaintiffs clearly stated the extent of the coverage provided by the issued policy and the plaintiffs should have therefore been aware that the policy did not provide the coverage they subsequently alleged that the insurance agent failed to procure. 917 So.2d at 154-55. Thus, the Court of Civil Appeals reasoned, a finding of contributory negligence as a matter of law was warranted for the following reason:
“[I]n light of the clear language of the [insurance] policy issued to the Kanellis-es, the record is susceptible only to the conclusion that, as a matter of law, the Kanellises ‘“put [themselves] in danger’s way” ’ and had a ‘ “conscious appreciation of the danger” ’ of suffering a monetary loss [if the event the Kanellis-es allege they sought insurance to protect themselves from occurred].”
917 So.2d at 155. Applying Kanellis to the facts of this case, Morris argues that the application agreement and the conditional receipt apprised the Colzas that there was no guarantee of immediate cov *1250 erage based on Dante’s application for coverage and that they accordingly should have had a conscious appreciation of the danger they faced if Dante died before a completed policy issued.
In response, Kimberly argues that this Court has never held that contributory negligence is a defense to a negligent-procurement claim and that Kanellis is inapposite. A review of our caselaw confirms Kimberly’s assertion that this Court has not previously reached a holding equivalent to the one reached by the Court of Civil Appeals in Kanellis, that is, that a plaintiffs failure to read his or her insurance documents may constitute contributory negligence as a matter of law, barring a negligent-procurement claim against an agent. To the contrary, this Court specifically rejected such a claim in Hickox v. Stover, 551 So.2d 259 (Ala.1989). However, part of our holding in Hickox was subsequently overruled, and a review of its rationale is accordingly appropriate. See Hillcrest Ctr., Inc. v. Rone, 711 So.2d 901, 905 n. 2 (Ala.1997) (“In Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala.1997), this Court overruled Hickox v. Stover, 551 So.2d 259 (Ala.1989), and readopted the ‘reasonable reliance’ standard of review.”).
In Hickox, an insured brought several claims, including a negligent-procurement claim, against an insurance agent and the agencies that employed the agent after it was determined that the policy the agent sold the insured would cover only one-third of a claimed $300,000 loss because of a co-insurance penalty in the policy. 551 So.2d at 260-61. The trial court held that the claim was barred by the insured’s contributory negligence, stating:
“‘[The agent’s] letter of April 4, 1983, and the receipt of the ... policy in July of 1983 were enough, as a matter of law, to constitute notice to the [insured] that the coverage under the new policy was not the same as under [the insured’s replaced] policy. The [insured] took no action to alleviate the potential problems in coverage under the [new] policy. Since the [insured] failed to take reasonable steps to correct the potential problems under the new policy, which the ordinary prudent person would have taken under the circumstances, the negligent conduct of the [insured] was a proximate contributing cause of its injury. The [insured] was, as a matter of law, contributorily negligent. Count four of the complaint for negligence must therefore be dismissed as to [the defendants].’ ”
Hickox, 551 So.2d at 263-64 (quoting order of the trial court).[6] The insured subsequently appealed that judgment to this Court, which reversed the judgment of the trial court, stating:
“The [insured] argues on appeal that the question of whether [its manager] and, through [its manager], the [insured] was contributorily negligent for failing to take some action or to investigate further so as to learn that [its new] policies differed from the [replaced] policy in an unfavorable way is a question of fact that precludes summary judgment on the contributory negligence issue. We have held that ‘[t]he burden of proving contributory negligence and that it proximately caused the injury is on the defendant, and [that] a determination of *1251 the existence of contributory negligence is for the jury where there is a scintilla of evidence to the contrary.’ Hatton v. Chem-Haulers, Inc., 393 So.2d 950, 954 (Ala.1981) (citing Elba Wood Products, Inc. v. Brackin, 356 So.2d 119 (Ala.1978)). We hold that the defendants have failed to carry their burden of proving that, as a matter of law, [the insured’s manager] and the [insured] were guilty of contributory negligence. [The insured’s manager] presented testimony indicating that he did’ not understand the letter from [the agent] or the policy endorsements. Moreover, neither the April 4 letter nor the receipt of the policy, as shown above, triggered a conclusion that the plaintiffs’ claim for negligence is barred as matter of law.”
551 So.2d at 265.[7] Thus, the Hickox Court effectively held that the defendants had not established contributory negligence as a matter of law because the insured had submitted evidence that its manager did not understand a letter from the selling agent and the terms of the actual insurance policy — which explained the extent of the insurance coverage actually procured by the agent for the insured and revealed that that coverage was not equivalent to the coverage the insured alleges he charged the agent to procure. ■
However, when Hickox was overruled by Foremost Insurance Co., this Court held that, with regard to a fraud claim, a
“trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms.”
693 So.2d at 421. The Foremost Court also recognized a plaintiffs “general duty ... to read the documents received in connection with a particular transaction,” along with a duty to inquire and investigate. Id. In Ex parte Caver, 742 So.2d 168, 172 (Ala.1999), we subsequently summarized the effect of Foremost by noting that “Foremost ended the era of ‘ostri-ehism’ ” that had begun with Hickox. We have since applied Foremost in numerous cases to justify a judgment as a matter of law when plaintiffs have ignored clear written terms in documents provided them in association with a transaction. AmerUs Life Insurance Co. v. Smith, 5 So.3d 1200, 1215-16 (Ala.2008), is typical of these eases. We stated in AmerUs Life:
“In light of the language of the documents surrounding the insureds’ purchase of the life-insurance policies at issue in this case and the conflict between [the agent’s] alleged misrepresentations and the documents presented to [the insured], it cannot be said that [the insured] reasonably relied on [the agent’s] representations. As this Court stated in Torres [v. State Farm Fire & Cas. Co., 438 So.2d 757 (Ala.1983)]: ‘[T]he right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of *1252 precaution to safeguard their interests.’ 438 So.2d at 759. The insureds here took no precautions to safeguard their interests. If nothing else, the language in the policies and the cost-benefit statement should have provoked inquiry or a simple investigation of the facts by [the insured]. Instead, based upon the record before us, we must conclude that Smith ‘blindly trust[ed]’ [the agent] and ‘closefd] [his] eyes where ordinary diligence require[d] [him] to see.’ Munroe v. Pritchett, 16 Ala. 785, 789 (1849). Moreover, the testimony of [the agent that subsequently acquired responsibility for the selling agent’s policies] that ‘there were things in the wording [of the policies] and the way things were laid out that allowed the individual to come up with the wrong assumption’ does not resolve the issue whether, as a matter of law, a reasonable person, upon reading the entire policy and the cost-benefit statement, would be put on inquiry as to the consistency of those documents with the previous representations by [the first agent]. Of course, if so, that person is then charged with knowledge of all of the information that the inquiry would have produced. Redman v. Federal Home Mortgage Corp., 765 So.2d 630, 634-35 (Ala.1999); Baxter v. Ft. Payne Co., 182 Ala. 249, 252-53, 62 So. 42, 43 (1913). We conclude that no reasonable person could read the policies and the cost-benefit statement and not be put on inquiry as to the existence of inconsistencies, thereby making reliance on [the agent’s] representations unreasonable as a matter of law. Because the insureds failed to present substantial evidence indicating that [the insured’s] reliance on [the agent’s] representations was reasonable, [the defendant] is entitled to a [judgment as a matter of law].”
As evidenced by this case and by Foremost ’s other progeny, we have essentially held that it is almost never reasonable for an individual to ignore the contents of documents given him or her in association with a transaction.[8] Although the Foremost line • of cases deals primarily with fraud claims, there is no .reason this principle should not apply to other claims' as well. The documents in this case clearly apprised the Colzas that Dante was not guaranteed immediate coverage upon submitting his application for life insurance to Morris. By not reading the documents, they took a risk and put themselves in danger’s way. We do not think it unreasonable to conclude as a matter of law that, in this day and age, any adult of sound mind capable of executing a contract necessarily has a conscious appreciation of the risk associated with ignoring documents containing essential terms and conditions related to the transaction that is the subject of the contract.[9] Thus, we *1253 agree with the rationale of the Court of Civil Appeals in Kcmellis and hold that, because the Colzas “ ‘ “put [themselves] in danger’s way” ’ and had a ‘ “conscious appreciation of the danger” ’ of suffering a monetary loss,” Kanellis, 917 So.2d at 155, in the event Dante died before the conditions for immediate coverage were met, any negligent-procurement claim is barred by the doctrine of contributory negligence.
We further note that other courts have similarly held that a plaintiff’s contributory negligence can, as a matter of law, bar a recovery on a negligent-procurement claim when the plaintiff failed to read documents that would have notified him or her regarding the extent of the insurance coverage that the defendant agent actually procured for him or her. For example, in General Insurance of Roanoke, Inc. v. Page, 250 Va. 409, 464 S.E.2d 343 (1995), an insured asserted a negligent-procurement claim against his insurer and the agent who sold him a policy covering his business property and equipment after incurring a loss in a fire and discovering the insurance policy sold him by the agent did not cover approximately $16,000 of that loss. In holding that the defendants were entitled to a judgment as a matter of law as a result of the insured’s negligence in failing to read his insurance policy, the Supreme Court of Virginia stated:
“The agent contends on appeal, as it did at trial, that [the insured’s] failure to read the insurance policy constituted negligence, as a matter of law, and that such negligence proximately caused his losses and precluded recovery against it. While we previously have not decided the precise issue presented in the present case, we have held that one who signs an application for life insurance without reading the application or having someone read it to him is chargeable with notice of the application’s contents and is bound thereby. Peoples Life Ins. Co. v. Parker, 179 Va. 662, 667, 20 S.E.2d 485, 487 (1942); Royal Insurance Co. v. Poole, 148 Va. 363, 376-77, 138 S.E. 487, 491 (1927). We also have held that the failure of a grantor to read a deed will not relieve him of obligations contained therein. Carter v. Carter, 223 Va. 505, 509, 291 S.E.2d 218, 221 (1982). See Metro Realty v. Woolard, 223 Va. 92, 99, 286 S.E.2d 197, 200 (1982) (absent fraud, one who has capacity to understand written document and' signs it without reading it or having it read to him is bound thereby). While the decisions cited are contract cases, we think the same rule should apply in negligence actions.
“In the present case, [the agent] handed [the insured] the insurance policy that stated plainly on its face that the building was insured for $20,000 and the personal property of others on the premises was insured for $15,000. [The insured], however, never so much as looked at the insurance policy, but simply placed it in a desk drawer.
“[The insured] testified that he has reading difficulties. [The insured] had a duty, nonetheless, to have his wife, who *1254 occasionally helped with business matters, or someone else read the policy to him if he could not read it. We conclude, therefore, that [the insured’s] failure to read the policy or to have someone read it to him constitutes negligence as a matter of law that bars a recovery against the agent.”
250 Va. at 411-12, 464 S.E.2d at 344-45 (footnote omitted; emphasis added). See also Dahlke v. John F. Zimmer Ins. Agency, Inc., 252 Neb. 596, 600, 567 N.W.2d 548, 551 (1997) (affirming a judgment as a matter of law entered in favor of the defendant insurance agency and agent on the plaintiffs negligent-procurement claim because “[the plaintiffs] failure to read the policy provisions insulates the insurance agent from liability”), and Keown v. Holman, 268 S.C. 468, 471, 234 S.E.2d 868, 869 (1977) (reversing a judgment entered on a jury verdict in favor of the plaintiff on his negligence claim against an insurance agent who failed to automatically renew a policy upon its expiration because the “plaintiff was contributorily negligent in not reading his policy [and] defendant’s motion for a directed verdict should have been granted on this ground”).
Some jurisdictions, however, have instead taken the position that an insured’s failure to read an insurance policy might amount to contributory negligence barring a negligent-procurement claim but that such failure does not constitute contributory negligence as a matter of law. The Supreme Court of Montana explained this view in Fillinger v. Northwestern Agency, Inc., of Great Falls, 283 Mont. 71, 78-79, 938 P.2d 1347, 1352 (1997):
“Under similar circumstances involving the relationship between the insured and their agent, several jurisdictions have held that while the insured’s failure to read the policy may amount to contributory negligence, it does not operate as a bar to relief as a matter of law. Fiorentino [v. Travelers Ins. Co.], [ (E.D.Pa.1978) ] 448 F.Supp. 1364; Floral Consultants, Ltd. v. Hanover Ins. Co. (1984), 128 Ill.App.3d 173, 83 Ill.Dec. 401, 470 N.E.2d 527; Kirk v. R. Stanford Webb Agency, Inc. (1985), 75 N.C.App. 148, 330 S.E.2d 262; Martini v. Beaverton Ins. Agency, Inc. (1992), 314 Or. 200, 838 P.2d 1061, 1067. We are persuaded by the reasoning of this line of authority that an insured does not have an absolute duty to read their policy, but their failure to do so may amount to contributory negligence.
“The Oregon Supreme Court succinctly explained its adoption of this view in Martini by explaining that:
“ ‘Insureds and insurance policies are not all alike. Insureds range from unsophisticated individuals who know nothing about insurance, to experienced business persons knowledgeable about insurance, to large corporations with batteries of lawyers. The relevant provisions of the policy may be simple (the address of the insured premises, for example) or complex. A jury should be allowed to consider two questions: Under the relevant circumstances, was it unreasonable in the light of foreseeable risks for the insured not to read the policy? If so, did the insured’s unreasonable failure to read the policy contribute to the insured’s damages?’
“Martini, 838 P.2d at 1067. ’The court in Fiorentino explained how the reliance upon one’s agent affects the duty to read:
“ ‘When the insured informs the agent of his insurance needs and the agent’s conduct permits a reasonable inference that he was highly skilled in this area, the insured’s reliance on the agent to obtain the coverage that he *1255 has represented that he will obtain is justifiable. The insured does not have an absolute duty to read the policy, but rather only the duty to act reasonably under the circumstances. The circumstances vary with the facts of each case, and depend on the relationship between the agent and the insured.’
“Florentino, 448 F.Supp. at 1369.”
It appears from this excerpt that those courts that have adopted the view that an insured’s failure to read insurance documents does not constitute contributory negligence as a matter of law view an insured’s duty to read such documents less strictly than do Alabama courts. For example, the Florentino court states that an insured is “justified]” in relying on an agent to procure the requested coverage if “the agent’s conduct permits reasonable inference that [the agent] was highly skilled in this area,” 448 F.Supp. at 1369. We have taken a decidedly stricter view. See, e.g., Maloof v. John Hancock Life Ins. Co., 60 So.3d 263, 271 (Ala.2010) (noting that this Court has “repeatedly” stated that it is not reasonable “for [an] insured to rely on an insurance agent’s representations about an insurance policy when those representations are contradicted by language in the insurance policy itself’). In light of our caselaw emphasizing the strict duty of a party to read the documents he or she is provided in connection with a transaction — a duty that is limited only by the extremely narrow grounds set forth in Potter v. First Real Estate Co., 844 So.2d 540 (Ala.2002), see note 8, supra, which are inapplicable in this case — we accordingly align ourselves with those courts, such as Page, that authorize a judgment as a matter of law in favor of an agent on a negligent-procurement claim when documents available to the insured clearly indicate that the insurance in fact procured for the insured is not what the insured subsequently claims he or she requested the agent to procure, as opposed to those courts, such as Fillinger, that would nevertheless hold that contributory negligence is an issue for the jury to decide. We have previously applied these principles in contract and fraud cases, and, as the Supreme Court of Virginia stated in Page, “we think the same rule should apply in negligence actions.” 250 Va. at 412, 464 S.E.2d at 345.
Morris properly moved the trial court to enter a judgment as a matter of law in his favor on Kimberly’s negligent-procurement claim based on Kimberly and Dante’s contributory negligence. That motion should have been granted, and the judgment subsequently entered on the jury’s verdict in favor of Kimberly is accordingly due to be reversed.
V.
Kimberly sued Alfa and Morris asserting claims of breach of contract, bad-faith failure to pay, and negligent procurement after Alfa denied her claim for life-insurance benefits following Dante’s death after he had completed an application for a life-insurance policy but before that policy was issued. Following a jury trial, the jury returned a verdict in favor of Kimberly and against Alfa on her breach-of-contract and bad-faith-failure-to-pay claims and in favor of Kimberly and against Morris on her negligent-procurement claim. However, for the reasons discussed above, Alfa and Morris were entitled to a judgment as a matter of law on those claims, and the trial court erred by submitting the claims to the jury for consideration. Accordingly, we reverse the judgment in favor of Kimberly and render a judgment as a matter of law in favor of Alfa and Morris. Because of this Court’s resolution of the issues, we pretermit discussion of all other matters raised in the briefs of the parties.
*1256 REVERSED AND JUDGMENT RENDERED.
BOLIN, PARKER, MAIN, WISE, and BRYAN, JJ., concur.
MURDOCK, J., concurs in part and dissents in part.
MOORE, C.J., dissents.

. This case was assigned to Justice Stuart on November 13, 2013.

. At the time Dante applied for insurance, Alfa provided four published premium rates: Preferred Non-Tobacco, Standard Non-Tobacco, Preferred Tobacco, and Standard Tobacco. During the application process, Dante admitted to the recent past use of tobacco. Based on the information provided to him, Morris selected the Preferred Tobacco premium rate for Dante.

. The record indicates that Dante’s work schedule prevented him from having the medical examination sooner.

. Although the question on the application asked about moving traffic violations in the prior three years, Dante apparently provided the medical examiner with his history of moving traffic violations for the prior five years.

.Alfa obtained a copy of Dante’s motor-vehicle report, which confirmed that Dante had-had two traffic violations in the last three years.

. The trial court also held that the insured’s negligent-procurement claim was time-barred; the Hickox Court reversed that holding. There is no dispute that Kimberly’s negligent-procurement claim was timely, and we accordingly do not address that aspect of Hickox.

. Of course, the "scintilla rule” applied in Hickox has been abolished in favor of the substantial-evidence rule; accordingly, once a defendant establishes that a plaintiff's contributory negligence proximately caused his or her injury, contributory negligence becomes a jury issue only if there is substantial evidence to the contrary. See generally Crutcher v. Williams, 12 So.3d 631, 652 (Ala.2008) (recognizing that § 12-21-12, Ala.Code 1975, abolished the scintilla rule and stating that, "[t]o defeat a motion for a judgment as a matter of law, the 'nonmovant must have presented substantial evidence’ ” (quoting Wad-dell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003) (emphasis added in Crutcher))).

. In Potter v. First Real Estate Co., 844 So.2d 540, 548-51 (Ala.2002), we noted that the general rule may be avoided when there have been misrepresentations regarding the contents of a document and there are special circumstances, a special relationship between the parties, or the plaintiff suffers from a disability rendering him or her unable to discern the contents of the document. The evidence in the record in this case, however, indicates that both of the Colzas were literate, and there is no evidence of special circumstances, a special relationship, or a disability that would implicate Potter.

. Indeed, it would seem more unreasonable to allow plaintiffs to prevail on negligent-procurement claims in spite of their failure to read documents that put them on notice of the extent of their insurance coverage when that same failure to read already bars a fraud or breach-of-cohtract claim based on the same essential facts. See, e.g., Locklear Dodge City, Inc. v. Kimbrell, 703 So.2d 303, 306 (Ala.1997) ("[The plaintiff] is capable of reading; she simply chose not to read this contract because her husband was ill and because she trusted [the defendant]. In light of these factors, it is understandable that [she] *1253 might choose not to read the contract before signing it. She took a risk. However, [she] should not be excused from her contractual responsibilities because she took that risk. To hold otherwise would turn the concept of ‘sanctity of contract' upside down.”). See also Nance v. Southerland, 79 So.3d 612, 619 (Ala.Civ.App.2010) (recognizing that "a party capable of reading and understanding English given the opportunity to review an insurance application cannot avoid the legal consequences of signing that document, indicating his or her assent to its terms on the basis that he or she did not read it”). Nothing in the evidence established that Dante requested to review the application and that Morris denied him that opportunity.