BOLIN, Justice.
Jim Bishop Chevrolet-Buick-Pontiac-GMC, Inc. (“Jim Bishop”), appeals from a judgment entered on jury verdicts in favor of Michael Andy Burden (“Burden”) and his wife Tina Burden in the amount of $132,500. '

Facts and Procedural History

On July 17, 2012, the Burdens sued General Motors, LLC, Jim Bishop, and Lynn Layton Chevrolet, Inc. (“Lynn Layton”), seeking to recover damages for injuries they allegedly sustained as the result of a fire that occurred in a truck they had purchased from an automobile dealership owned and operated by Jim Bishop (“the Jim Bishop dealership”). The Burdens asserted various claims against various defendants in their complaint, including a products-liability claim under the Alabama Extended Manufacturer’s Liability Doctrine (“the AEMLD”); a claim asserting negligence and wantonness in the design and manufacture of the truck; breach of express and implied warranties; a claim under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq.; and a claim alleging that the defendants had negligently and wantonly failed to repair the truck and to warn of the inherent danger in operating the truck. Tina asserted a loss-of-consortium claim.
On August 21, 2012, General Motors filed its answer generally denying the alie- *796 gations contained in the complaint and asserting certain affirmative defenses. On October 3, 2012, Lynn Layton filed its answer also generally denying the allegations contained in the complaint and asserting certain affirmative defenses. On November 11, 2012, Jim Bishop filed its answer also generally denying the allegations contained in the complaint and asserting certain affirmative defenses. Jim Bishop further asserted a cross-claim against General Motors pursuant to § 8-20-4(3)(o), Ala.Code 1975, alleging it had refused to indemnify Jim Bishop.
On August 20, 2013, General Motors moved the trial court for a summary judgment as to the AEMLD and negligent and wanton design and manufacture claims asserted against it by the Burdens. General Motors argued that the Burdens had failed to provide information regarding the expert witnesses who would be testifying in support of those claims before the expiration of the trial court’s scheduling deadline for providing that information. See Rule 26, Ala. R. Civ. P. Therefore, General Motors contended, the Burdens’ claims under the AEMLD and their negligent and wanton design and manufacture claim were not sustainable because those claims required the presentation of expert testimony. Both Jim Bishop and Lynn Layton moved the trial court for a summary judgment as to the AEMLD claim and the negligent and wqnton design and manufacture claim, adopting General Motors’ motion for a summary judgment.
On September 9, 2013, the Burdens filed a response to the defendants’ motions for a summary judgment as to the AEMLD and the negligent and wanton design and manufacture claims, stating that they did not “object to deleting the causes of action which require an expert finding of the specific cause and origin of the fire.” On September 11, 2013, the trial court entered an order dismissing both the AEMLD and negligent and wanton design and manufacture claims.
Thereafter, the Burdens entered into pro tanto settlements with General Motors, which agreed to pay them $20,000, and Lynn Layton, which agreed to pay them $32,000, as to the respective claims asserted by the Burdens against those defendants. The settlement with General Motors resolved the breach-of-warranty claims and the Magnuson-Moss claim. The trial court dismissed the Burdens’ claims against both General Motors and Lynn Layton pursuant to joint stipulations of dismissal filed by those parties.
On July 29, 2014, Jim Bishop moved the trial court for a summary judgment on the Burdens’ remaining claims against it, contending, among other things, that it was entitled to a summary judgment on the Burdens’ negligent-failure-to-repair and failure-to-warn claims, arguing that it had not undertaken a duty to repair the vehicle; that expert testimony was necessary to establish the cause of the fire that destroyed the truck; and that the Burdens had previously admitted that expert testimony establishing the cause of the fire is not available. On August 6,2014, the Burdens filed a response in opposition to Jim Bishop’s summary-judgment motion. On September 25, 2014, the trial court entered an order denying Jim Bishop’s summary-judgment motion.
On May 26, 2015, General Motors moved the trial court to sever, pursuant to Rule 21, Ala. R. Civ. P,, Jim Bishop’s cross-claim against it seeking indemnification. On May 27, 2015, the trial court entered an order granting General Motors’ motion to sever Jim Bishop’s cross-claim.
The case proceeded to trial on the Burdens’ claims against Jim Bishop alleging negligent repair and failure to warn of the hazardous condition of the truck and Tina’s loss-of-consortium claim. Jim Bishop *797 moved the trial court for a preverdict judgment as a matter of law (“JML”) at the close of the Burdens’ evidence and then again at the close of all the evidence. The trial court denied both motions. The jury returned a verdict in favor of Burden for $100,000 and a verdict in favor of Tina for $32,500. On June 15, 2015, the trial court entered a judgment for $132,500 in favor of the Burdens based on the jury’s verdicts. On July 6, 2015, Jim Bishop moved the trial court for a postverdict JML or, in the alternative, for a new trial. On August 12, 2015, the trial court denied Jim Bishop’s postjudgment motion. Jim Bishop appeals.
The evidence presented at trial indicates the following. On September 11, 2009, Burden purchased a new Chevrolet Silver-ado 1500 pickup truck from Jim Bishop. Before that purchase, Burden had purchased a number of vehicles from Jim Bishop. After purchasing the truck, Burden began noticing a “distinct” smell in the cabin of the truck that would “come and go” when he was driving it. Burden, an experienced electrician employed at a local paper mill, described the smell as a “smoke-ish type burning” odor. He explained that there was never a consistent pattern to the odor and that it would just come and go, lasting in duration anywhere from a few seconds to 10 minutes. Burden stated that he experienced the burning odor approximately 100 times while he had the truck and had on occasion lifted the hood of the truck and inspected the engine compartment himself trying to find the source of the odor.
On January 6, 2010, Burden took the truck to the “quick lube lane” at the Jim Bishop dealership to have the oil in the truck changed.[1] Burden testified that he asked the employee who changed his oil if he could see anything under the truck that might be causing the odor. The oil-change technician told Burden that he did not see anything under the truck that could be causing the odor.
Later, on that same date, Burden was traveling to Huntsville in the truck to visit his father when the “service engine light” came on and he again noticed the burning odor. Burden testified that at that time the odor was prominent and smelled like something was “hot” or was “going to burn.” Burden decided to have the truck inspected at a Chevrolet dealership operated by Lynn Layton, which was on the way to Burden’s Huntsville destination. Burden explained to the service-department employee at the Lynn Layton dealership that he smelled something “hot” or something “burning” in the truck. The service department reprogrammed the “power-train control module” and informed Burden that the technicians could not find anything causing the odor. Burden stated that an employee in the service department at the Lynn Layton dealership told him that he was “possibly smelling the new burning off the truck.”
On May 3, 2010, Burden brought his truck into the service department at the Jim Bishop dealership, again complaining of the burning odor and of a “popping” noise. Burden testified that he explained to the service-department employee that an employee in the service department at the Lynn Layton dealership had told him that the burning odor he was smelling was the “new burning off.” Burden stated that the Jim Bishop employee responded, *798 “[Y]eah, it could be possible.” The service department at the Jim Bishop dealership eventually discovered that the rack and pinion steering was leaking fluid and determined that the rack and pinion steering needed to be replaced. At that time, the service department added rack and pinion steering fluid and ordered the parts necessary to replace the rack and pinion steering.
Burden testified that he continued to smell the burning odor intermittently when he would drive the truck. On May 19, 2010, Burden returned to the service department at the Jim Bishop dealership to have the new rack and pinion steering installed. Burden testified that he again complained to the service department about the burning odor. Burden stated that the service-department employee told him that “they would look into it.” After examining the truck for the cause of the odor, the service department informed Burden that it “did not find anything wrong with it.” The service department installed the rack and pinion steering on the truck at this time.
Burden testified that he subsequently returned to the service department at the Jim Bishop dealership complaining of the burning odor emanating from the truck. Burden stated that the service department examined the truck for the source of the burning odor and again informed him that it “could not find anything wrong.” Burden further testified that the service-department employee told him, if he could, to bring the truck back in while the burning odor was actively emanating from the truck.
Burden testified that on July 22, 2010, at approximately 1:00 p.m., he began smelling the burning odor. Burden proceeded immediately to the service department at the Jim Bishop dealership as he had been asked to do by the service-department employee. Burden stated that he telephoned the service department to notify it that he was coming in with the truck. Burden stated that when he arrived at the service department he left the truck running and informed the service-department employee that the burning odor was emanating from the truck. Burden stated that he was told by the service-department employee that “we don’t have time to look at it.” Burden testified that he could not wait for the service department to get to his truck because he had to be at work at 2:30 p.m. Burden stated that he offered to leave the truck if the service department could provide him with a “loaner” vehicle and that he was told by the service-department employee that the Jim Bishop dealership no longer provided “loaner” vehicles.[2] Burden also testified that he inquired about renting a vehicle and that the service-department employee told him that he would schedule a service appointment for Burden. The service-department employee scheduled a service appointment for Burden for the following Monday, July 26, 2010. Burden stated that he did not inquire of the service-department employee if the truck was safe to drive.
Burden left the service department and drove directly to his job. After working his shift at the paper mill, Burden clocked out at approximately 2:00 a.m. on the morning of July 23, 2010, and headed home. Burden testified that as he drove home he began to smell the burning odor in the truck. He stated that the odor became more intense and that smoke started coming from the dashboard. Burden testified that the hazard lights on the truck started blinking, that the horn start *799 ed blowing, that he lost power steering, and that when he tried to stop the truck he realized that he had lost the function of the brakes. Burden testified that, as the smoke and heat became more intense in the cabin of the truck, he tried to open the truck door so that he could “bail out,” but that the doors of the truck would not open. Burden stated that he began to choke on the smoke and started to panic. He testified that he tried to break the driver’s side window by hitting it with his arm but was unsuccessful. Burden estimated his speed to be approximately 30 to 35 m.p.h. at that time. Burden testified that he finally put the transmission of the truck in park and the truck began to slow down. He stated that, when he put the transmission in park, the door locks opened, allowing him to open the door and “bail out” of the truck onto the road. Burden telephoned E-911 and his wife to notify them of the accident.
The first responders found Burden sitting on the ground approximately 100 feet behind the truck, which was now burning. Burden initially stated that he “felt fine” and that he did not want to be transported to the hospital. However, the paramedic on the scene noticed that Burden’s breathing was labored and that he was in a “state of shock.” Burden was transported to the hospital for treatment and was released approximately four hours later. Burden testified that his memory of the events occurring that morning after he bailed out of the truck was vague.
The truck was completely engulfed by fire and was a total loss. Both Jim Bishop and Cotton States Insurance Company, Burden’s insurer, had certified fire investigators examine the vehicle to determine the cause of the fire. Although it was determined that the fire started in the left side of the engine compartment, the actual cause of the fire was undeterminable because of the extensive damage to the truck. Cotton States indemnified Burden for the loss of the truck.
James E. Bishop testified on behalf of Jim Bishop. Bishop was the former owner of Jim Bishop and the Jim Bishop dealership, having sold both to his son in 2007. Bishop testified that the service department cannot diagnose every problem presented to it, that several things can cause a new vehicle to smell, and that electrical problems are among some of the more difficult issues to diagnose. Bishop stated that if a dealership is unable to diagnose a problem “then you get [General Motors] involved.” Bishop testified that, if a technician at the Jim Bishop dealership cannot identify a particular problem, then the Jim Bishop dealership would contact the technical representative at General Motors, who would work to diagnose the problem via a computer or actually come to the service department to address the issue. Bishop further stated that the customers are also able to contact General Motors directly concerning a problem. He stated that, if contacted by a customer, General Motors would diagnose the problem and then contact the dealership to give it a description of the problem. The dealership would then contact the customer and have the customer come in so that the dealership could make the necessary repairs.
On cross-examination, Bishop was asked by counsel for the Burdens whether the Jim Bishop dealership had in place a policy or procedure for dealing with vehicles that come into the service department that are too dangerous to drive. Bishop stated that he was unaware of any such policy or procedure the Jim Bishop dealership had in place and that in such a case he would think that the customer should “park” the vehicle and “put it in the shop.” He stated that if the service department could not identify a problem with the vehicle he *800 would not think there was a problem with the vehicle and that it would be safe to drive. Counsel for the Burdens then asked Bishop whether it was reasonable for the service department to allow Burden to leave the service department with the truck after the service department had failed on several occasions to diagnose the source of the burning odor; had not contacted the General Motors technical-assistance representative for assistance in diagnosing the source of the burning odor; and had told Burden to bring the truck in the next time it was emanating the burning odor, which Burden had done. Bishop responded that if the service department was full the customer would either leave the vehicle at the Jim Bishop dealership or take the vehicle with him or her and that which course to take, based on safety concerns, would be the decision of the service-department representative.

Standard of Review

The standard of review for a ruling on a motion for a JML is as follows:
“ ‘When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Cranford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmov-ant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).’
“Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003).”
CSX Transp., Inc. v. Miller, 46 So.3d 434, 450-51 (Ala.2010).

Discussion

Jim Bishop argues, among other things, that the trial court erred in denying its motion for a JML and submitting the Burdens’ claims against it to the jury because, it says, the Burdens failed to establish that there was a breach of a duty owed them that proximately resulted in the fire. The Burdens contend that Jim Bishop breached the duty to discover and to repair a dangerous condition within the truck that proximately caused the fire. Specifically, the Burdens contend that Jim Bishop did not “seriously consider” Burden’s complaints regarding the burning odor emanating from the truck and did not adequately “undertake to discover and correct” a dangerous condition that existed within the truck.
In order to recover on a negligence claim, a plaintiff must establish the existence of (1) a duty; (2) a breach of that duty; (3) proximate causation; and (4) an injury. Alfa Life Ins. Corp. v. Colza, 159 So.3d 1240, 1248 (Ala.2014).
Jim Bishop relies upon Brooks v. Colonial Chevrolet-Buick, Inc., 579 So.2d 1328 *801 (Ala.1991), in support of its argument that the Burdens failed to establish, by expert testimony, a breach of duty. In Brooks, the Brookses purchased a vehicle from Colonial that was manufactured by General Motors. On January 14, 1987, as Ms. Brooks was driving the vehicle out of the driveway, the brakes failed, causing the vehicle to collide with a fence, injuring Ms. Brooks. The following day, the Brookses took the vehicle to Colonial, complaining that the brakes had failed and requesting that Colonial inspect and repair the brakes. At that time, Colonial inspected the brake system and its component parts by removing the front and rear wheels to see if there was something causing a sticking or binding with the brakes; inspecting the brake drums to verify that there was no overheating; sanding and cleaning the brake drums; and bleeding and flushing the brake system to be certain that there was no air in the system that could be causing a problem. Colonial’s service manager stated that, although the inspection revealed no problem with the brakes or the brake system, it undertook those steps as a precautionary measure to convince itself that there was no problem with the brakes or the brake system.
The Brookses continued to experience problems with the brakes as they drove the vehicle. On February 12, 1987, the Brookses returned to Colonial for inspection, maintenance, and repair of the brakes. Colonial again thoroughly tested and inspected the brakes and the brake system and concluded that there was no problem with the brake system. On February 16, 1987, the Brookses returned to Colonial, again complaining of brake problems. Colonial took the vehicle to an independent repair facility for a follow-up inspection to ascertain if there was a problem Colonial had not found, but those findings indicated that there was nothing wrong with the brakes or the brake system.
The Brookses continued to complain of problems with the brakes. On March 2, 1987, Colonial’s service manager, along with another employee from Colonial, picked up the vehicle from the Brookses’ house and drove it to the dealership. As the service manager drove the vehicle back to Colonial, he attempted to simulate the problems the Brookses had complained of, but the brakes worked perfectly. Even though the service manager had experienced no actual problem with the brakes, when the vehicle was in the repair shop, as a further precautionary measure and at the suggestion of a General Motors representative, Colonial replaced the master cylinder, a part of the braking system. Subsequently, on March 23, 1987, the brakes failed as the Brookses were driving down an incline. The Brookses suffered injuries when they jumped from the vehicle before it collided with an embankment and caught fire.
The Brookses sued General Motors asserting a claim under the AEMLD alleging defective design of the brakes. The Brookses also asserted a claim against Colonial alleging negligent repair of the brakes. The trial court entered a summary judgment in favor of General Motors and Colonial on the claims asserted against them by the Brookses.
On appeal, this Court determined that, as to the negligent-repair claim asserted against Colonial, there was no evidence presented to support that claim “other than the fact .of the accident itself,” Brooks, 579 So.2d at 1334. This Court stated:
“In order to present a prima .facie case of negligent repair on Colonial’s part, the Brookses had the burden of presenting substantial evidence that, taking into account all of the attendant circumstances, Colonial did something or failed to do something that would violate *802 the proper standard of care one must observe in repairing a brake system. The Brookses presented no expert testimony; in fact, the Brookses presented no evidence whatever regarding the quality of the repair work performed by Colonial when it attempted to substantiate and to correct the problems the Brookses alleged they had experienced with the brakes.”
Brooks, 579 So.2d at 1334.
In this case, other than casually mentioning the burning odor to the oil-change technicians at the Jim Bishop dealership, who Burden acknowledged were not repair technicians, the evidence suggests that the Jim Bishop dealership actually retained the truck on three occasions in an attempt to diagnose the source of the burning odor. On May 3, 2010, Burden brought the truck into the service department complaining of the burning odor and of a “popping” noise. The service department determined at that time that the rack and pinion steering was leaking fluid and needed to be replaced. On May 19, 2010, Burden returned to the service department at the Jim Bishop dealership to have the new rack and pinion steering installed. Burden again complained to the service department at that time about the burning odor emanating from the truck and was told by the service-department employee that “they would look into it.” After examining the truck to determine the cause of the burning odor, the service department informed Burden that it “did not find anything wrong with it.” Additionally, Burden stated that at some subsequent point in time he returned to the service department at the Jim Bishop dealership again complaining of the burning order emanating from the truck. The service department examined the truck for the soui’ce of the burning odor and again informed Burden that it “could not And anything wrong.”
To the extent that the Burdens claim that Jim Bishop was negligent in failing to identify and repair the source of the burning odor, we note that the Burdens were required to present substantial evidence establishing that the Jim Bishop dealership either did something, or failed to do something, on the three occasions that the Jim Bishop dealership undertook to diagnose the source of the burning odor that would violate the standard of care a service department must adhere to in diagnosing an intermittent burning odor emanating from a mechanically complex and sophisticated vehicle. However, the Burdens failed to present any expert testimony, or any evidence whatsoever, of the appropriate standard of care to be adhered to when a service department undertakes to diagnose the cause of such an intermittent burning odor. No evidence, expert or otherwise, was presented indicating what procedures or techniques were undertaken by the Jim Bishop dealership on the occasions that it retained the truck to diagnose the cause of the intermittent burning odor and whether those procedures or techniques were sufficient or of the kind and quality reasonably necessary to diagnose the cause of the intermittent burning odor.
The Burdens also contend that Jim Bishop breached the duty owed to them on the occasion that Burden was “turned away” by the Jim Bishop dealership less than 24 hours before the vehicle fire and was allowed to drive the truck—that they claim was in a dangerous condition—away from the service department after he had been asked by a service-department employee to bring the truck in when the burning odor was actively emanating from the truck. The circumstances attending that occasion were that the Jim Bishop dealership had failed on three prior occasions to diagnose the source of the burning odor; that the Jim Bishop dealership had *803 not contacted the technical representative at General Motors; that Burden had driven the truck for approximately 10 months without an incident, other than the odor and “popping” noise; that Burden was asked to bring the truck to the service department when the burning odor was actively emanating from the truck; that the service department was backed up and could not “get to” Burden’s truck when he arrived at the Jim Bishop dealership; that he was asked to leave the truck but chose not to because he had to be at work; that Burden was allowed to drive the truck away when the Jim Bishop dealership was unable to provide Burden with a “loaner”; and that the Jim Bishop dealership scheduled a service appointment for Burden for the following Monday.
Again the Burdens failed to present any evidence, expert or otherwise, as to how the actions taken by Jim Bishop under the attendant circumstances constituted a breach of duty owed them that proximately resulted in the vehicle fire. The Burdens presented no expert testimony as to the appropriate standard of care owed by Jim Bishop under the attendant circumstances and how the actions taken, or not taken, by the service department of the Jim Bishop dealership on that occasion were unreasonable and proximately resulted in the mechanically complex and sophisticated vehicle catching fire the following day. Although counsel for the Burdens questioned Bishop, who was not qualified as an expert, on the topic of the reasonableness of the service department’s “turning [Burden] away,” he offered only that in such a situation the customer would have the opportunity to either leave the vehicle with the service department or leave the service department with the vehicle and that that determination was left to the service-department representative. Accordingly, we conclude that the Burdens failed to establish a breach of a duty owed them.
As to the Burdens’ claim that Jim Bishop breached a duty to warn of a hazardous condition within the truck and allowed Burden to drive the truck away from the Jim Bishop dealership on the day before the fire, we note that this contention presumes that a hazardous condition existed within the truck of which Jim Bishop was aware when Burden drove away from the Jim Bishop dealership. The lack of expert testimony as to the existence of a dangerous condition in the truck notwithstanding, the circumstances existing at the time Burden drove the truck away from the Jim Bishop dealership, as set forth above, indicate that Jim Bishop knew only of a previously undiagnosed intermittent burning odor emanating from the truck. The Burdens presented no expert testimony demonstrating how Jim Bishop breached its duty in failing to recognize that a hazardous condition existed within the truck and failed to warn Burden of the condition under the circumstances that existed when Burden left the Jim Bishop dealership in the truck. Accordingly, we conclude that the Burdens failed to establish a breach of a duty to warn owed to the Burdens.
In this case, as in Brooks, the only evidence presented to support the Burdens’ claims that Jim Bishop was negligent in failing to identify and repair the source of the burning odor and to warn of a hazardous condition is the fact that the Burdens had taken the truck to the Jim Bishop dealership on several occasions complaining of the burning odor, that the Jim Bishop dealership could not identify the source of the odor, and that the truck subsequently caught fire. The failure to identify and repair the source of the burning odor, standing alone, is insufficient to establish a prima facie case of negligent repair. Brooks, supra. Tina’s loss-of-consortium claim, which is dependent on Burden’s claims, likewise fails. Accordingly, we *804 conclude that the trial court erred in failing to grant Jim Bishop’s motion for a JML and in submitting the case to the jury. Therefore, we reverse the judgment entered in favor of the Burdens on the jury’s verdicts and render a judgment for Jim Bishop.
REVERSED AND JUDGMENT RENDERED.
STUART, PARKER, MURDOCK, SHAW, MAIN, and BRYAN, JJ., concur.
MOORE, C.J., dissents. •

. The Jim Bishop dealership has an express oil-change lane that serves to expedite oil changes and other similar vehicle servicing. The express oil-change lane is separate from the service department, which actually diagnoses and repairs any mechanical problems a vehicle may be experiencing. The Jim Bishop employees who work in the express oil-change lane are not mechanics.

. The record indicates that the Jim Bishop dealership had indeed previously canceled its "loaner” program for financial reasons.