MAIN, Justice.
Pursuant to Rule 5, Ala. R.App. P.,[1] this Court granted Alfa Life Insurance Corporation (“Alfa”), Josh Griffith, a licensed insurance agent for Alfa, and Judy Russell, also a licensed insurance agent for Alfa *1093 (hereinafter sometimes referred to collectively as “the defendants”), permission to appeal from the Etowah Circuit Court’s order entered on October 8, 2014, denying the defendants’ renewed motion for a summary judgment. We reverse the trial court’s order and remand the cause for proceedings consistent -with this opinion.

I. Facts and Procedural History

On January 26, 2011, Wanchetta Reese (“Reese”), individually and as owner and beneficiary" of the life-insurancé policy issued on the life of her husband Lee V. Reese, filed a complaint in the Etowah Circuit Court against the defendants, setting forth, in pertinent part, the following factual assertions: ,
“4. On April 14, 2010, Reese met with ... Alfa and Griffith to purchase life insurance on her husband, Lee V. Reese (here[in]after [‘Lee Reese’]). The defendants completed an application to insure the life of [Lee" Réese] under a policy of life insurance to be issued' by Alfa with ... Reese as named beneficiary.
“[Reese] advised [the] Defendants that she' sought 'to obtain life insurance on [Lee Reese] so that she would have funds available to bury him in the event of his death. Griffith, as the agent of Alfa, suggested that [Reese] apply for no more than $15,000.00 in life insurance since this was the maximum amount of insurance that could be sold without [Lee Reese] undergoing a physical examination. ’
“5. ... Griffith, as the agent, servant or employee of Alfa acting within the line and scope of his employment, asked a series of questions of Reese in completing [on a laptop computer] an application for the policy of life insurance on [Lee Reese], ... ihcluding quéstions about [Lee Reese’s] past medical history. [Reese] provided answers to the questions , asked of her by Griffith who completed, the application for insurance.
“6. ... Griffith read to Reese a question on the application regarding whether or not [Lee Reese] had diabetes, kidney failure or amputation. Reese answered these questions truthfully and advised [the] defendants that [Lee Reese] suffered from chronic kidney disease, diabetes, and an amputation of his-leg below the knee;
“7. After being advised of [Lee Reese’s] medical condition, Griffith stát-éd to Reese that he needed to ask Russell .for advice in' completing the application. In the presence of Reese, Griffith advised Russell of the medical issues of [Lee Reese], Russell advised Griffith; in the presence of Reese, to not put that information in the application.
“8. After the application was completed, Griffith and Reese stepped out of the office building into the parking lot where [Lee Reese] was sitting in a pickup truck. [Lee] Reese had removed his artificial leg. prosthesis on his left leg[,] which had been amputated,, and the prosthesis was in plain view of Griffith in,the vehicle when Griffith asked [Lee Reese] to electronically sign the application. [Lee] Reese was unable to sign the application and Griffith had ... Reese sign both her name and [Lee Reese’s] name to the application.
“9. After the application was eom-pleted, Reese paid a premium in the amount of $167.87. [Reese] made a second supplemental payment the following month in the same amount.
“10. [Lee Reese] passed away uriex-pectedly on May 23, 2010.. [Reese] made application for policy benefits with the aid and assistance of [the] Defendants and the claim was denied by Alfa in a letter dated August 16, 2010.”
*1094 The complaint stated four counts: Count I alleged breach of contract against Alfa; count II alleged bad faith against Alfa; count III generally alleged fraud (including' fraudulent misrepresentations)[2] against the defendants; and count IV alleged that the defendants had committed the tort of outrage.
On February 28, 2011, Alfa filed a consolidated counterclaim and motion to dismiss. In its counterclaim, Alfa sought rescission of the life-insurance policy; Reese, as owner of the policy, and, Lee Reese, as the insured, were each required to sign the policy application that was completed and submitted to Alfa. Accordingly, Alfa, in its counterclaim, asserted, in pertinent part:
“In the application for the above stated policy, the deceased, Lee V. Reese, as the insured, and Wanchetta Reese, as the owner and named beneficiary, made misrepresentations, omissions, misstatements, incorrect statements, and concealed facts regarding Lee V. Reese’s physical health.
“The misrepresentations, omissions, misstatements, incorrect statements, and concealed facts concerning [Lee Reese’s] health condition were fraudulent and/or weie material either to the acceptance of the risk or to the hazard assumed by Alfa, or Alfa, in good faith, would not have issued the policy, or would not have issued the policy at the premium rate as applied for, or would not have issued the policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to Alfa.”
Alfa further asserted that “[t]he application for the aforesaid policy .,. sets forth questions directed to- the insured,” which were answered as follows:
“Under the topic of the subject policy, ‘IF ANY’ANSWER TO THE FOLLOWING QUESTIONS IS “YES,” THE PROPOSED INSURED IS NOT ELIGIBLE FOR COVERAGE:
“ 'Have you ever ...
“ ‘Been diagnosed with Diabetes Requiring Insulin (injection or Pump) or have you ever had ... treatment for Kidney Failure; [or] Amputation due to Disease ... ?’
‘“Answer: “No.”’
“(Application) ([capitalization and bold typeface] emphasis original).”
Moreover, Alfa asserted:
“5. The insured, Lee Reese, represented to. Alfa that the foregoing answers in his application of April 14, 2010, were ‘complete and true to the best of [his] knowledge and bejief (Application Agreement).
“6. By signing the application, Lee Reese agreed as follows:
“T HAVE TRULY ANSWERED THE ABOVE QUESTIONS AND I HAVE READ, OR HAD READ TO ME, THE COMPLETE APPLICATION. I REALIZE THAT MY FALSE STATEMENTS, MISREPRESENTATIONS OR CONCEAL-MENTS WHICH WOULD AFFECT THE ACCEPTANCE OF THE RISK ASSUMED MAY RESULT IN LOSS OF COVERAGE, SUBJECT TO INCONTESTABILITY PROVISIONS AND/OR THE TIME LIMIT ON CERTAIN DEFENSE PROVISIONS OF THE POLICY.’
*1095 “(Application) ([capitalization and bold typeface] emphasis original).
“7. Alfa relied upon the information provided by [Lee V. 'Reese] in his application in approving the policy and setting its premium.
“8. ... [0]n or about May 24, 2010, [Lee Reese] ... died.....
“9. The immediate cause of death was cardiac arrhythmia and failure, renal failure, and ASVD (also known as artherosclerosis [sic])_
“10. On or about June 16, 2010, Alfa received a ‘Request for Payment of Insurance Benefits,’ signed and submitted by ... Reese....
“11. [Lee Reese] was diagnosed with ‘Diabetes Requiring Insulin (injection or Pump)’ prior to his. application for life insurance on or about April 14, 2010....
“12. [Lee Reese] was treated for ‘Kidney Failure’ prior to his application for life insurance on April 14, 2010
“13. [Lee Reese] also had had an ‘Amputation due to Disease’ prior to his application for life insurance on April 14,2010....
“14. Based upon medical records, Alfa is informed and believes, and based upon that information and belief alleges, that the deceased insured, Lee V. Reese, died as an immediate result of cardiac arrest and failure, renal failure, and atherosclerosis, being contributorily caused by ‘Diabetes Requiring Insulin (injection or Pump),’ and ‘Kidney Failure,’ with an indicating factor being (Amputation due to Disease.’ ([bold typeface] emphasis added).
“16. Alfa alleges that the aforesaid policy of insurance affords no insurance coverage or insurance benefits to [Reese], Specifically, .Alfa ... avers that Alfa life insurance policy-number LI2999 provides no insurance- coverage in that- it was void ab initio due to untruthful answers to application question 12, insofar as it was (1) fraudulent; (2) material either to the acceptance of the risk or to the hazard assumed by the insurer;- or (3)’ the insurer, in-good faith, would 'either not have issued the policy or contract, or would not- have issued a policy or-contract at the premium rate as applied for, or would not have issued the policy or contract in as large an amount, or would not. have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as- required either by the application- for the policy, or contract, or otherwise. See Code of Alabama 1975, § 27-14-7(a).[3]
“16. On August 16, 2010, Alfa sent ... Reese a letter refunding her premium payments and notifying her of Alfa’s denial of death benefits on Alfa life insurance policy number LI2999 based on the foregoing misrepresentations, omis *1096 sion's, concealment of facts, or incorrect statements ....”
(Emphasis, other than as indicated, added.) Thus, Alfa could seek rescission of the life-insurance policy under § 27-14-7(a)(3), Ala.Code 1975, because, Alfa said, it would not have issued- the' policy or would have issued: the policy under different terms had it known that the signed application Reese submitted contained. misrepresentations, concealment of facts, and incorrect statements regarding Lee Reese’s medical-conditions. According to Alfa, Reese, who admittedly did not read the application, knew that the misrepresentations, concealment of facts, and incorrect statements regarding Lee Reese’s medical conditions were contained in- the application based on the conversation she overheard between Griffith and Russell at Alfa’s office.
In seeking to dismiss Reese’s action, Alfa -argued, in 'sum, (1) thati Reese’s breach-of-contract and bad-faith claims must be dismissed because, Alfa said, the life-insurance contract was void ab initio as a result of the fraudulent and material misrepresentations of material facts regarding Lee .Reese’s medical conditions on the application, which Reese nonetheless signed without objection; that Reese could not rely on alleged oral misrepresentations by Alfa’s -agents regarding the .viability of the life-insurance policy because the life-insurance application stated that “[n]o agent or any other person is authorized by [Alfa] to waive or modify in any way any of the conditions or provisions contained in this application or policy of insurance”; and that “[a] failure to read the application is no excuse for the Reeses”-; (2) that Reese’s tort-of-outrage claim failed to state a claim upon which relief could be granted, see Rule 12(b)(6), Ala. R. Civ. P., because, Alfa said, “[n]one of [Reese’s] allegations fall within the limited scope [of the action of the tort of outrage] recognized in Alabama (citing Wyant v. Burlington Northern Santa Fe R.R., 210 F.Supp.2d 1263 (N.D.Ala.2002), and Callens v. Jefferson Cnty. Nursing Home, 769 So.2d 273, 281 (Ala.2000)); and (3) that Reese’s fraud claim was due to be dismissed because, Alfa said, “the circumstances constituting fraud” were not “stated with particularity”, in the complaint, see Rule 9(b), Ala. R. Civ. P. (citing, among other cases, Drummond Co. v. Walter Indus., Inc., 962 So.2d 753, 787-88 (Ala.2006)). Griffith and Russell also filed a joint motion to dismiss., Reese’s action in which they “incorporated] Alfa’s Motion to Dismiss as if set forth herein verbatim.”
In a memorandum brief in response to the motions to dismiss, Reese stated: (1) “Alfa ... cannot void or rescind the policy based upon any misrepresentation in the application of insurance pursuant to § 27-14-7 if the responsibility for the false information was that of the agent who was fully apprised of the insured’s medical problems yet opted to omit that from the policy in order to procure a policy of insurance”; (2) “[i]n Alabama, the conduct of the agent in completing the application is imputed to the insurance company [because] the agent was an employee of the company.... [K]nowledge to [sic] the agent of the omission of correct information in the application would be imputed to his employer, Alfa. Alfa, with knowledge of the false information contained within the application, nevertheless accepted the application and premium, issued the policy of insurance, then denied the claim knowing the application contained false information, which would constitute evidence of outrageous conduct,” and the same argument is applicable to Reese’s bad-faith claim; and (3) “[t]he Factual Background of the Complaint explicitly sets forth the acts constituting the fraud” and, even if the allegations of fraud were nonspecific, “then leave may be granted under Rule 15, [Ala. R. Civ. P.], to allow [Reese] to amend the pleadings to conform to the evidence.”
*1097 On May 13, 2011, the trial court entered an order (1) granting the defendants’ motions to dismiss as to count IV (tort of outrage); (2) denying the motions to dismiss as to the other three counts; and (3) denying the motions to dismiss insofar as they sought an order requiring Reese to plead her allegations of fraud with more particularity. Thereafter, the defendants filed a consolidated answer to Reese’s complaint, and Reese filed an answer to Alfa’s counterclaim, which sought rescission of the life-insurance policy.
On September 27, 2012, the defendants filed a consolidated motion seeking a summary judgment on the three remaining counts (breach of contract, bad faith, and fraud); in the same motion, Alfa sought a summary judgment on its counterclaim seeking rescission of the life-insurance policy. The summary-judgment motion basically restated the factual assertions set forth in Alfa’s motion to dismiss: that Alfa relied on misinformation contained in the application in deciding whether to issue the life-insurance policy; that Reese did not read the application containing the misinformation before signing it, and, if she had, she would have known that the application contained false statements regarding Lee Reese’s medical conditions that could be cause for cancellation of the policy and/or loss of coverage and that no information provided to Griffith was binding on Alfa unless made part of the application; that there could be no amendment to the application by the agent; that- the application is made part of the life-insurance policy; that the medical issues misstated in the application and not caught by Reese because she did not even attempt to read the application - were, according to Lee Reese’s attending physician, contributing factors to Lee Reese’s death; and that Alfa issued the life-insurance policy because it relied on the information in the application signed by Reese, who knew it contained false information regarding Lee Reese’s health. The defendants supported their summary-judgment motion with substantial documentary evidence and a brief.
Reese filed a response to the' defendants’ motion for a summary judgment, stating the facts as follows: Reese went to an Alfa office and spoke with Griffith about purchasing a life-insurance policy that would provide enough money for burial expenses upon Lee Reese’s death. According .to Reese, “Griffith explained Alfa offered a $15,000.00 policy with no health requirements and no requirement of a physical exam”; Reese proceeded to apply for that policy. While answering questions Griffith asked from the application, Reese advised Griffith that Lee Reese was diabetic and that he took insulin. Griffith then sought counsel from Russell, who allegedly told Griffith not to include that information in the application.- Pursuant to Russell’s advice, Griffith also omitted from the application the fact that Lee Reese received his insulin through injection or pump. Reese further advised Griffith that her husband had had bypass surgery and that he wore a prosthesis for an amputated leg. Nevertheless, Reese claimed, the- application was completed, and .Reese (without objection) and Griffith signed the application, which had been completed on what Reese referred to as a “computer device.”[4] Reese admittedly *1098 did not read the application, was not asked to read the application, did not “look at” the application, and was not “refused an opportunity by the agent” to read the application. Reese’s response to the defendants’ summary-judgment motion was supported by documentary evidence ' and a brief.
After receiving a reply brief from the defendants and holding a hearing on the matter, the trial court, on February 20, 2013, entered an order granting the defendants’ summary-judgment motion in part and denying the motion in part. Specifically, the trial court granted the summary-judgment motion as to Reese’s bad-faith claim but denied the motion- as to Reese’s breach-of-contract and fraud claims and also denied the motion as to Alfa’s counterclaim seeking rescission of the life-insurance policy. The trial court certified that order as final pursuant to Rule 54(b), Ala. R'. Civ. P. The defendants requested that the trial court alter, amend, ,or vacate the partial denial of their summary-judgment motion, and, in the same motion, requested that,the trial court “enter an Order certifying the controlling issue for [Rule 5, Ala. R.App. P.,] interlocutory appeal.” The trial court denied' both requests in a written order.
Subsequently, Reese moved the trial court for permission- to amend her complaint, alleging a new count IV entitled “fraud, deceit, and. suppression” (allegations . already contained in the original complaint) against Alfa and Griffith (the original count IV, alleging the tort of outrage, had already been dismissed by the trial court). The defendants moved the trial court to strike and/or dismiss the amended count IV.[5] On August 14, 2013, the trial court entered an order granting Reese’s motion for permission to amend her complaint and denying the defendants’ motion to strike and/or dismiss the amended count IV. Alfa and Griffith filed a motion for a summary judgment as to count IV of the amended complaint’ After receiving a response from Reese to the motion for a partial summary judgment, the trial' court granted Alfa and Griffith’s motion for a summary judgment as to count IV of the amended complaint and ordered that that judgment be made' final pursuant to Rule 54(b), Ala. R. Civ. P.
On July 25, 2014, the defendants filed a renewed motion for a summary judgment as to Reese’s two remaining claims and Alfa’s counterclaim' seeking rescission of the life-insurance policy. In their brief supporting their renewed summary-judg *1099 ment motion, the defendants discussed extensively this Court’s then quite recent decision in Alfa Life Insurance Corp. v. Colza, 159 So.3d 1240 (Ala.2014). Counsel for Alfa in the present case also represented Alfa in Colza. Counsel alleged that “the material facts [in Colza] are substantially similar to [those in] the instant case”; that Colza governed in this case; and that this Court’s decision in Colza mandated that the trial court enter a summary judgment in favor of the defendants on all of Reese’s remaining claims (breach of contract against Alfa and fraud against all the defendants) and on Alfa’s counterclaim seeking'rescission of the life-insurance policy. Reese filed a memorandum brief in response to the defendants’ renewed .summary-judgment motion, asserting that Colza is distinguishable rom the present case and, therefore, that it ‘does not control here. On September 25, 2014, the trial court denied the defendants’ renewed motion for a summary judgment.
On October 1, 2014, the defendants moved the trial court to certify for interlocutory appeal its September 25,. 2014, order denying their renewed motion for a summary judgment. See Rule 5, Ala. R.App. P, The defendants argued that, contrary to the trial court’s view, Colza controls and, thus, that “the interlocutory order involves a controlling question of law as to which there is substantial ground for difference of opinion, that an.immediate appeal from the order would materially advance the ultimate termination of: the litigation, and that the appeal would avoid protracted and expensive litigation.”- See Rule 5. The trial court denied the motion in a written order.
On October 8, 2014, the defendants filed a second motion asking the trial court to certify for interlocutory appeal its September 25, 2014, order. This time, the trial court granted the motion and certified the following controlling questions of law:
“1. Can a misrepresentation regarding the contents of a document be sufficient in and of itself for a reasonable jury to find an exception to the duty to read?
“2. Where there is no evidence of a special relationship between the parties and no evidence that the plaintiff suffers from- a disability rendering her unable to discern the contents of the' document, can .a plaintiff nevertheless be relieved of the duty to read?
“3. Can information that an agent allegedly obtained in the application process be imputed to the insurance company where the application agreement states, ‘Nó information or knowledge obtained by any agent ... in connection with this Application shall be construed as having been made known to or binding upon the Company’?”
This Court granted the defendants’ petition for a permissive appeal.

II. Standard of Review

“ ‘ “We apply the same standard of review [in reviewing the grant or denial of a summary-judgment motion] as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material 'fact exists and-that the movant is-entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala.Code 1975, § 12-21-12.” ’
*1100 tence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala.Code 1975, § 12-21-12.”
“Mutual Assurance, Inc. v. Schulte, 970 So.2d 292, 295 (Ala.2007) (quoting Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004)).”
Panayiotou v. Johnson, 995 So.2d 871, 875-76 (Ala.2008).

III. Issues

The defendants summarize their, arguments as follows:
“The Circuit, Court Order denying [the defendants’] renewed motion for summary judgment conflicts with Alabama case, law under[, among other cases,] Alfa Life Ins. Corp. v. Colza because there is no'evidence upon which to grant an exception to the strict duty to read. Reese is held to know what is written in the application she signed, the documents given to her when she sighed the application, and the contents of her policy. Her fraud claims fail for lack of reasonable reliance.
“Additionally, as stated by the clear and unambiguous language in the notices given to Reese and the application signed by .Reese, no health information allegedly- told to the agents but not put in writing was made known to Alfa. Alfa has a right to rely on the written application submitted by Reese and rescind any policy issued where there are material misrepresentations in the application.”
The defendants argue strenuously and almost exclusively on appeal that Colza controls here and that Colza mandates that the trial court enter a summary judgment in favor of the defendants on Reese’s remaining claims and in favor of Alfa on its counterclaim for rescission of the life-insurance policy.[6] Under the facts of this ease, we agree.
The relevant facts in Colza were as follows:
“On September 2, 2010, [Brandon] Morris [an agent for Alfa] met with Dante [Colza] to assist him in completing an application for a life-insurance policy in the amount of $150,000. Kimberly [Colza, Dante’s wife,] and Justin Morton, an employee of Dante’s, were also present at the meeting. The application process for an Alfa life-insurance policy consists of three parts: the applicant’s completion of an application agreement, the applicant’s answering various health questions , before a medical examiner, .and the, medical examiner’s report.. Morris testified that he asked Dante the questions- in the application agreement and then typed the answers on the application form on his laptop computer. Although the evidence is disputed as to whether Morris asked Dante, question 16(g) — whether Dante had had a moving traffic violation, a driver’s licehse suspended, or an accident in the prior three years — it is undisputed that Morris entered a check-mark in the ‘No’ box by that question. The evidence indicated that Dante applied for the Preferred Tobacco premium rate [beeaüse Dante admitted to using tobacco in the recent past]; Dante named Kimberly as the beneficiary under the policy. Disputed evidence was presented as to whether Dante himself signed the application agreement.
“At the close of the meeting, Morris provided Dante and Kimberly with -a hard-copy document entitled ‘Applicant’s Copy of Notices-Authorization-Agreement-Receipt Signed Electronically’ *1101 (hereinafter referred to as ‘the application agreement’). The relevant portion of the application agreement stated:
“T understand and agree with the Company that:
“ ‘1. Any policy issued as a result of this Application shall constitute a single and entire contract of insurance .... Only the President, a Vice President, the Secretary or Actuary of the Company may waive or, vary a contract provision or any of the Company’s rights or requirements and such waiver must be in writing. Only the Company’s Underwriters have any authority to accept or approve the insurance applied [for] or to pass upon insurability.
“‘2. To the best of my knowledge and belief all of the statements and answers on the Application are true, complete, and correctly stated, and I understand the statements and answers aré submitted to the Company as the basis for any policy issued, and if incorrect can be cause for cancellation or loss of coverage.

"'....

“‘4. I authorize the Company to amend this Application by a notation in the space set aside for “Home Office Endorsements” to correct apparent errors or omissions and to conform the Application to any policy that may be issued by the Company. Acceptance' of the policy issued based on this Application will be acceptance of its terms and ratification by me of any changes specified in the section marked “Home Office Endorsements.” Any change in plan or amount of insurance or added benefits must be agreed to in writing.’
“The application agreement completed by Dante referenced another document entitled ‘Conditional, Receipt,’ which stated in relevant part:
“‘1. CONDITIONS TO COVERAGE: NO INSURANCE WILL BECOME EFFECTIVE BEFORE THE DELIVERY AND ACCEPTANCE OF A POLICY OF INSURANCE UNLESS AND UNTIL EACH AND EVERY ONE OF THE FOLLOWING CONDITIONS IF [sic] FULFILLED EXACTLY;
[[Image here]]
, “‘6. NO AGENT, GENERAL OR SPECIAL, OR ANY OTHER PERSON IS AUTHORIZED BY THE COMPANY TO WAIVE' OR MODIFY IN ANY WAY ANY OF THE CONDITIONS OR PROVISIONS CONTAINED IN THIS CONDITIONAL RECEIPT.’
“(Capitalization in original.) Conflicting evidence’ was presented at trial as to whether Morris provided Dante and Kimberly with’ a hard copy of the conditional receipt; however, Kimberly acknowledges that she’received an identical conditional receipt when she applied for her own life-insurance policy approximately two weeks before Dante applied for his.
[[Image here]]
“Dante was examined by the medical examiner on.October 15, 2010. During the 'examination, Dante informed the medical examiner that his family had a history of heart disease and that he had had moving traffic violations within the past five years, On October 16, 2010, the- day after he had- his medical examination, Dante was killed in an accident. Two days later, Alfa received the medical examiner’s report, which indicated that Dante’s family had a history of heart disease, that Dante’s cholesterol was above 255, and. that Dante had had moving traffic violations in the past five years.
*1102 “In light of Dante’s high cholesterol level and his family history of heart disease, the Alfa underwriters determined -that Dante was not eligible for the Preferred Tobacco rate for which he had applied; rather, the proper classification for Dante would have been the Standard Tobacco rate, which had a higher premium. Additionally, in light of Dante’s moving-vehicle violations, Dante was a greater risk to insure and a [higher premium for] coverage was required
“On October 25, 2010, Alfa notified Kimberly by letter that no life-insurance coverage was available for Dante’s death ‘because no policy was issued and the conditions of coverage under the.conditional receipt were not met.’[7]
“On April 13, 2011, Kimberly sued Alfa seeking to recover under the terms of the conditional receipt. She alleged, among other claims, that Alfa had breached the contract and had acted in bad faith when it refused to pay life-insurance benefits on Dante’s death. Kimberly also sued Morris, alleging, among other claims, that he had negligently failed to procure insurance coverage for Dante. After a trial, the jury found that Alfa had breached the contract and had in bad faith refused to pay the insurance benefits due pursuant to that contract and that Morris had negligently failed to procure insurance for Dante. The trial court entered a judgment in the amount of $440,674.94 against Alfa and in the amount of $100,000 against Morris. Alfa and Morris submitted motions for judgments as a matter of law at the close of the evidence and after the entry of the judgment. The trial court denied the motions. Alfa and Morris appealed].”
Colza, 159 So.3d at 1242-46 (footnotes omitted).
On appeal, this Court reversed the trial court’s judgment and rendered a judgment in favor of Alfa, finding, among other things, that a “ ‘trial court can enter a judgment as- a 'matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents,' but nonetheless made a deliberate decision to ignore written contract terms.’ ” Colza, 159 So.3d at 1251 (quoting Foremost Ins. Co. v. Parham, 693 So.2d 409, 421 (Ala.1997)).
As noted, the first controlling question of law certified to this Court in this permissive appeal is: “Can a misrepresentation regarding the contents of a document be sufficient in and, of itself for a reasonable jury to find an exception to the duty to read?” Stated differently, the issue is whether misrepresentations to Reese by Alfa’s agents — that the life-insurance policy would be effective despite the false statements in the application regarding Lee Reese’s health and despite the contractual language stating (a) that Alfa’s agents have no authority to unilaterally modify a life-insurance , policy and (b) that misrepresentations in the application could result in cancellation and/or lack of coverage — excepted Reese from her legal duty to “ ‘read the documents received in connection with a particular transaction.’” Colza, 159 So.3d at 1251 (quoting Foremost, 693 So.2d at 421). The answer to this question is clearly “no.” As this Court stated in Colza:
*1103 “ ‘In light of the language of the documents surrounding the insureds’ purchase of the life-insurance policies at issue in this case and the conflict between [the agent’s] alleged misrepresentations and the documents presented to [the insured], it cannot be said that [the insured] reasonably relied on [the agent’s] representations. As this Court stated in Torres [v. State Farm Fire & Cas. Co., 438 So.2d 757 (Ala.1983)]: “[T]he right of reliance comes with a concomitant duty on the ’ part of the plaintiffs to exercise some measure of precaution to safeguard their interests.” 438 So.2d at 759. The insureds here took no precautions to safeguard their interests. If nothing else, the language in the policies ... should have provoked inquiry or a simple investigation of the facts by [the insured]. Instead, based upon the record before us, we must conclude that [the appellant] “blindly trust[ed]” [the agent] and “close[d] [his] eyes where ordinary diligence require,[d] [him] to see.” Munroe v. Pritchett, 16 Ala. 785, 789 (1849). .... We conclude that no reasonable person could read the policies- ... and not be put on inquiry as to the existence of inconsistencies, thereby making reliance on [the agent’s] representations unreasonable as a matter of law. Because the insureds failed to present substantial evidence indicating that [the insured’s] reliance on [the agent’s] representations was reasonable, [the defendant] is entitled to a [judgment as a matter of law].’ ”
159 So.3d at 1251-52 (quoting AmerUs Life Ins. Co. v. Smith, 5 So.3d 1200, 1215—16 (Ala.2008)) (initial emphasis original; other emphasis added).
In Colza, this Court noted the well settled “duty-to-read” rale, which states that a plaintiff has a “ ‘general duty ... to read the documents received in connection with a particular transaction,’ along with a duty to inquire and investigate.” 159 So.3d at 1251 (quoting Foremost, 693 So.2d at 421). In this case, Reese admittedly made no attefnpt to read the application; her entire argument rests on her contention that she was never given ,a “reasonable opportunity” to read the application because it was filled out on a laptop computer. However, for all that appears, Reese decided to “blindly trust[]” the agents’ representations rather than taking even the most basic of precautions to “safeguard [her] interests.” 159 So.3d at 1252. As this Court further noted in Colza: “We do not think it unreasonable to conclude as a matter of law that, in this day and age, any adult of sound mind capable of executing a contract necessarily has a conscious appreciation of the, risk associated with ignoring documents containing essential terms and conditions related to the transaction that is the subject of the contract.” 159 So.3d at 1252. Thus, the trial court erred in failing to grant the defendants’ summary-judgment motion based on the, court’s apparent finding that the agents’ misrepresentations regarding the application would be. sufficient in and;of themselves to allow a reasonable jury to find an exception to the duty to read.
This Court’s main opinion in Colza sets forth seven pages of detailed analysis on the issue whether it is reasonable for a party to rely on oral representations about an insurance application/policy when a simple reading of the written document would show inconsistencies between the oral representations and that document. In Colza, this Court reviewed numerous cases, from this and other jurisdictions, considering both a lenient and a stricter view of the duty to read. After doing so, this Court stated; “We have taken a decidedly stricter view [of the duty to read],” Colza, 159 So.3d at 1255, i.e., that “any adult of sound mind capable of executing a contract necessarily has a conscious appreciation of the *1104 risk associated with ignoring documents containing essential terms and conditions related to the transaction that is the subject of the contract.” 159 So.3d at 1259.
The second controlling question of law presented to this Court by this permissive appeal is: “Where there is no evidence of a special relationship between the parties and no evidence that the plaintiff suffers from a disability rendering her unable to discern the contents of the document, can a-plaintiff nevertheless be relieved of the duty to read?” We answer this question too in the negative.
We are mindful that the duty-to-read rule may be avoided when there have been misrepresentations regarding the contents of a document and there are special circumstances or a special relationship between the parties or the plaintiff suffers from a disability rendering him or her unable to discern the contents of the document. See Potter v. First Real Estate Co., 844 So.2d 540, 548-51 (Ala.2002). However, none of those exceptions apply in this case, and Reese does not even specifically contend that any of those exceptions do apply. Reese merely generally posits that the fact that the application was completed on a laptop computer and had to be signed on a. separate signature pad constitutes “special circumstances.” Reese offers no authority in support of this argument. We hold that the trial court erred in failing to grant the defendants’ summary-judgment motion on the basis that Reese was not relieved by special circumstances of the duty to read.
The third controlling question of law presented to this Court by this permissive appeal is: “Can information that an agent allegedly obtained in the application process be imputed to the insurance company where the application agreement states, ‘No information or knowledge obtained by any agent ... in connection with this Application shall be construed as having been made known to or binding, upon the Company'?” Once again, we answer in the negative.
As Reese notes, she was given a hard copy of a document entitled “Notices-Authorization-Agreement-Receipt,” which states, in part:
“No information or knowledge obtained by any-agent .or any other person in connection with this Application shall be construed as having been made known to or binding upon the Company unless such information is in writing and made a part of this Application.” .
The defendants’ brief effectively answers this question:
“Again, Colza is controlling. In Colza, the applicants were given the same ‘Notices-Authorization-Agreement-Receipt’ as was given to Reese [in the present case]. The ‘Notices-Authorization-Agreement-Receipt’ in Colza contained a paragraph identical to the one written above. In Colza, the applicants were held to know the terms contained therein, limiting the agent’s authority. Just as the applicants in Colza were deemed to know the terms of that document, i.e.[,] that the agent .had no authority to issue an oral contract or to create immediate coverage, Reese was bound to know that information given to agents Griffith and Russell was not ‘made known to or binding upon [Alfa] unless [it] is in writing and made a part of this Application.’ Colza, [159 So.3d at 1252].”
Once again, we hold that the trial court erred in failing to grant the defendants’ summary-judgment motion on the basis that the information Reese provided Griffith was not imputed to, Alfa.
The present case is effectively summed up by the following language from a case released by the United States District *1105 Court for the Southern District of Alabama after Colza was released by this Court and that relied, at least in part, on this Court’s holding in Colza:
“The plain terms of the agreement contradict [the appellant’s] purported belief, based on [the appellee’s] alleged misrepresentations and/or due to allegedly suppressed information, that' her interest rate and. mortgage payments would be reduced. Faced with contract terms that did not comport with previous representations and her purported understanding of the state of affairs at the.time, [the appellant] had ‘a duty to inquire, and investigate’ these, inconsistencies. [Alfa Life Ins. Corp. v.] Colza, [159 So.3d 1240, 1251 (Ala.2014)]. The undisputed evidence, however, .indicates that [the appellant], while ‘fully capable of reading and understanding' the terms of the ... modification agreement, ‘nonetheless made a deliberate decision to ignore [those] written contract terms’ in favor of previous purported representations by [the appellee]. Foremost [Ins. Co. v. Parham], 693 So.2d [409,] 421 [(Ala.1997)]. Thus, [the appellant] cannot now claim that she reasonably relied on any purported misrepresentations by [the appellee], or on her understanding of the state of affairs'at the time, in accepting and signing the modification agreement.”
Givens v. Saxon Mortg. Servs., Inc. (No. 13-00245-KD-N, June 2, 2014) (S.D.Ala.2014) (not published in F.Supp.2d).

TV. Conclusion

As stated above, three controlling questions of law have been certified to’ this Court; we answer all three questions in the negative. Put simply, there exists no issue for a jury to resolve in this case, because the undisputed evidence shows (1) that Reese improperly relied on the agents’ oral representations regarding the validity of the application without making any attempt[8] to read the life-insurance-policy application, (2) that Reese made no attempt .to inquire into .or to investigate any inconsistencies between the agents’ oral representations and the language of the application, and (3) that, no exception to the duty to read applies here. It is clear that the application states: that the information obtained by the agents in the application process that is not contained in the application absolutely cannot be imputed to Alfa. Therefore, we reverse the trial court’s order denying the defendants’ summary-judgment motion as to all of Reese’s remaining claims and as to Alfa’s, counterclaim seeking rescission of the life-insurance policy, and we remand the cause for proceedings consistent with this opinion. Cf. Colza.
REVERSED AND REMANDED.
STUART, BOLIN, PARKER, WISE, and BRYAN, JJ., concur.
SHAW, J., concurs in the result,
MURDOCK, J., dissents (writing to follow).
MOORE, C.J., recuses himself.,

. Rule 5(a), Ala. R.App. P., provides:
"A party may request permission to appeal from an interlocutory order in civil actions under limited circumstances. Appeals of intérlocutory orders are limited to those civil cases that are within the original.appellate jurisdiction of the Supreme Court. A petition to appeal from an interlocutory order must contain a certification by the trial judge that, in the judge’s opinion, the interlocutory ord'er involved á controlling question of law as to which there is substantial ground for difference of opinion, that an immediate appeal from the order would materially advance the ultimate termination of the litigation, and that the appeal would avoid protracted and expensive litigation. The trial judge must include in the certification a statement of the controlling question of law.”

. The fraudulent misrepresentations were allegedly statements made by Alfa’s agents that Lee Reese was eligible for a $15,000 policy irrespective. of his numerous existing health problems, despite the express language of the application stating that a person with such health problems was ineligible for coverage,

. Alabama Code 1975,- § 27-14-7, provides, in pertinent part:
"(a) All statements and descriptions in any application for an insurance policy or annuity contract, or in negotiations therefor, by, or in behalf of, the insured or annuitant shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy .or contract unless either:
"(1) Fraudulent;
"(2) Material either to the acceptance of the risk, or to the -hazard assumed by the insurer; or , .
“(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract at the premium rate as -applied for, or would not have issued a policy or contract in as large-an amount or would not have provided coverage with respect to the hazard resulting in the loss if "the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.”

. Griffith clams that Lee Reese signed the application. However, according to Reese, Lee Reese did not sign the application even though he was present at the insurance agency while Reese and Griffith completed the application. Lee Reese, who was in very poor health at the time, remained in the Rees-es' truck and stated that he did not feel like signing the application when the computer device with the signing pad was presented to him. Reese, who held power of attorney for her husband, signed the application for him and, according to the allegations set forth in *1098 the complaint,' perhaps also signed his name to the application. : ;
It is undisputed that Reese held "power of attorney” for Lee Reese; that the power of attorney was a total or complete power of attorney; and that the power of attorney was effective and adequate. A power of attorney is "[a]n instrument granting someone authority to act as agent of attorney-in-fact for the grantor.” Black’s Law Dictionary 1191 (10th ed.2014). See also Arcweld Mfg. Co. v. Burney, 12 Wash.2d 212, 221, 121 P.2d 350, 354 (1942) ("By 'power of attorney’ is commonly meánt an instrument in writing by which one person, as principal^] appoints another as' his agent and confers upon such agent the authority to act in the place and stead of the principal for the avowed purpose, or purposes, set forth in the instrument.” (quoted with approval in Smith v. Wachovia Bank, N.A., 33 So.3d 1191, 1197 n. 5 (Ala.2009))). Thus, the execution of a power of attorney creates a principal-agent relationship. The “ ‘settled rale of agency [is] that an agent stands in the shoes” of his principal.' " Stevens v. Phillips, 852 So.2d 123, 130 (Ala.2002) (quoting Monsanto Co. v. Benton Farm, 813 So.2d 867, 874 (Ala.2001), and citing American States Ins. Co. v. C.F. Halstead Developers, Inc., 588 So.2d 870 (Ala.1991)) (emphasis added).

. All the defendants moved to strike and/or dismiss the amended count IV even though Reese named only Alfa and Griffith in the amended count.

. Reese agrees that the true issue is "whether Colza controls here and precludes application of the exceptions such that Reese could not reasonably rely upon the alleged representations under the undisputed evidence of this case."

. Dante had received from Alfa a document entitled "Conditional Receipt,” which outlined several conditions for coverage that Dante had to fulfill "exactly" before his insur-anee policy would become effective. Colza, 159 So.3d at 1244. Dante had not completed those conditions before his death.

. As noted, Reese admits that she was not "physically prevented from” reading the application.